(Slip Opinion) OCTOBER TERM, 2014 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## JENNINGS *v.* STEPHENS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 13–7211.   Argued October 15, 2014—Decided January 14, 2015

Petitioner Jennings sought federal habeas relief based on three theories of ineffective assistance of counsel during the punishment phase of his state capital murder trial.  The District Court granted relief on his two "*Wiggins* theories"—that counsel failed to present evidence of a deprived background and failed to investigate evidence of mental impairment, see *Wiggins* v. *Smith*, 539 U. S. 510—but not on his "*Spisak* theory"—that counsel expressed resignation to a death sentence during his closing argument, see *Smith* v. *Spisak*, 558 U. S. 139.  The court ordered Texas to release Jennings unless, within 120 days, the State granted him a new sentencing hearing or commuted his death sentence.  The State attacked the *Wiggins* theories on appeal, but Jennings defended on all three theories.  The Fifth Circuit reversed the grant of habeas corpus under the two *Wiggins* theories and determined that it lacked jurisdiction over the *Spisak* claim.  Implicitly concluding that raising this argument required a cross-appeal, the court noted that Jennings neither filed a timely notice of appeal, see Fed. Rule App. Proc.  4(a)(1)(A), nor obtained the certificate of appealability required by 28 U. S. C. §2253(c).

*Held*: Jennings' *Spisak* theory was a defense of his judgment on alternative grounds, and thus he was not required to take a cross-appeal or obtain a certificate of appealability to argue it on appeal.  Pp. 4–12.

   (a) Because Jennings is an appellee who did not cross-appeal, he may "urge" his *Spisak* theory unless doing so would enlarge his rights or lessen the State's rights under the District Court's judgment.

*United States* v. *American Railway Express Co.*, 265 U. S. 425, 435. Jennings' rights under the judgment were release, retrial, or commutation within a fixed time, at the State's option, and his *Spisak* claim, if accepted, would give him no more. The State's rights under the judgment were to retain Jennings in custody pending retrial or to commute his sentence; the *Spisak* claim, if accepted, would not further encumber the State. The State contends that, because the District Court's opinion entitled Jennings only to retrial (or resentencing) without the challenged errors*,* each additional basis asserted by Jennings sought to lessen the State's rights at retrial, and thus requires a cross-appeal. But this view is contrary to the ordinary behavior of courts, which reduce their opinions and verdicts to judgments precisely to define the parties' rights and liabilities. A prevailing party seeks to enforce a district court's judgment, not its reasoning. *Rogers* v. *Hill*, 289 U. S. 582, 587. Thus, any potential claim that would have entitled Jennings to a new sentencing proceeding could have been advanced consistent with *American Railway*. Pp. 4–9.

  (b) *Helvering* v. *Pfeiffer*, 302 U. S. 247, and *Alexander* v. *Cosden Pipe Line Co.*, 290 U. S. 484, would be in considerable tension with *American Railway* if they were read, as the State insists, as requiring Jennings to raise his *Spisak* claim on cross-appeal even if his rights under the court's judgment would remain undisturbed. *Pfeiffer* and *Alexander* involved disputes over multiple discrete federal tax liabilities, and the assertion of additional tax liabilities or defenses necessarily sought to enlarge or to reduce the rights of the Internal Revenue Service Commissioner. In contrast, Jennings, whether prevailing on a single theory or all three, sought the same, indivisible relief: a new sentencing hearing. Thus, *Pfeiffer* and *Alexander* cannot be viewed as contradicting the ' "inveterate and certain' " *American Railway* rule. *Greenlaw* v. *United States*, 554 U. S. 237, 245. Pp. 9–11.

  (c) The question whether 28 U. S. C. §2253(c)'s certificate of appealability requirement applies to cross-appeals need not be addressed here, for it is clear that the provision does not embrace the defense of a judgment on alternative grounds. Pp. 11–12.

537 Fed. Appx. 326, reversed and remanded.

  SCALIA, J., delivered the opinion of the Court, in which ROBERTS, C. J., and GINSBURG, BREYER, SOTOMAYOR, and KAGAN, JJ., joined. THOMAS, J., filed a dissenting opinion, in which KENNEDY and ALITO, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 13–7211

ROBERT MITCHELL JENNINGS, PETITIONER *v.* WILLIAM STEPHENS, DIRECTOR, TEXAS DE-PARTMENT OF CRIMINAL JUSTICE, COR-RECTIONAL INSTITUTIONS DIVISION

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[January 14, 2015]

JUSTICE SCALIA delivered the opinion of the Court.

Petitioner Robert Mitchell Jennings was sentenced to death for capital murder. He applied for federal habeas corpus relief on three theories of ineffective assistance of counsel, prevailing on two. The State appealed, and Jennings defended his writ on all three theories. We consider whether Jennings was permitted to pursue the theory that the District Court had rejected without taking a cross-appeal or obtaining a certificate of appealability.

I

In July 1988, petitioner Robert Mitchell Jennings entered an adult bookstore to commit a robbery. Officer Elston Howard, by unhappy coincidence, was at the same establishment to arrest the store's clerk. Undeterred, Jennings shot Howard four times, robbed the store, and escaped. Howard died from his wounds.

Howard was merely the most recent victim of Jennings' criminality. The State adjudicated Jennings a delinquent at 14, convicted him of aggravated robbery at 17, and of

additional aggravated robberies at 20. He murdered Officer Howard only two months after his most recent release from prison.

Jennings was arrested, tried, and convicted of capital murder, and the State sought the death penalty. During the punishment phase, the State introduced evidence of Jennings' lengthy and violent criminal history. Jennings' attorney called only the prison chaplain, who testified about Jennings' improvement and that Jennings was not "incorrigible." Jennings' attorney acknowledged the difficulty of his sentencing defense in his closing remarks, commenting that he could not "quarrel with" a death sentence, but was nonetheless pleading for mercy for his client. The jury returned a special verdict, consistent with Texas law, that Jennings acted deliberately in the murder and that he would present a continuing threat to society. The trial court sentenced Jennings to death. Texas courts affirmed Jennings' conviction and sentence and denied postconviction relief. *Jennings* v. *State*, No. AP–70911 (Tex. Crim. App., Jan. 20, 1993); *Ex parte Jennings*, 2008 WL 5049911 (Tex. Crim. App., Nov. 26, 2008).

Jennings applied for federal habeas corpus relief, asserting, as relevant here, three theories of ineffective assistance of counsel in the punishment phase of his trial. Jennings first claimed trial counsel was ineffective for failing to present evidence of his disadvantaged background, including that his conception was the product of his mother's rape, that his mother was only 17 when he was born, and that he grew up in poverty. Jennings offered his mother and sister as witnesses.

Jennings next argued that trial counsel was ineffective for failure to investigate and to present evidence of Jennings' low intelligence and organic brain damage. His trial attorney admitted in affidavit that he failed to review the case files from Jennings' prior convictions, which contained a report suggesting Jennings suffered from mild

mental retardation and mild organic brain dysfunction. (The report also suggested that Jennings malingered, feigning mental illness in order to delay proceedings.) Jennings argued that trial counsel should have examined Jennings' prior case files, investigated Jennings' mental health problems, and presented evidence of mental impairment in the punishment phase.

Finally, Jennings argued that counsel was constitutionally ineffective for stating that he could not "quarrel with" a death sentence. According to Jennings, this remark expressed resignation to—even the propriety of—a death sentence.

Jennings cited our decision in *Wiggins* v. *Smith*, 539 U. S. 510 (2003), as establishing constitutional ineffectiveness when counsel fails to investigate or to introduce substantial mitigating evidence in a sentencing proceeding. Though he did not cite our decision in *Smith* v. *Spisak*, 558 U. S. 139 (2010), he also argued that counsel's closing remarks amounted to constitutional ineffectiveness. The parties referred to these alleged errors as the "*Wiggins* errors" and the "*Spisak* error"; we use the same terminology.

The federal habeas court granted Jennings relief on both of his *Wiggins* theories, but denied relief on his *Spisak* theory. *Jennings* v. *Thaler*, 2012 WL 1440387 (SD Tex., Apr. 23, 2012). The court ordered that the State "shall release Jennings from custody unless, within 120 days, the State of Texas grants Jennings a new sentencing hearing or resentences him to a term of imprisonment as provided by Texas law at the time of Jennings['] crime." *Id.,* at *7.

The State appealed, attacking both *Wiggins* theories (viz., trial counsel's failure to present evidence of a deprived background and failure to investigate evidence of mental impairment). Jennings argued before the Fifth Circuit that the District Court correctly found constitu-

tional ineffectiveness on both *Wiggins* theories, and argued again that trial counsel performed ineffectively under his *Spisak* theory. The Fifth Circuit reversed the grant of habeas corpus under the two *Wiggins* theories and rendered judgment for the State. 537 Fed. Appx. 326, 334–335 (2013). The court determined that it lacked jurisdiction over Jennings' *Spisak* theory. *Id.,* at 338–339. Implicitly concluding that raising this argument required taking a cross-appeal, the panel noted that Jennings failed to file a timely notice of appeal, see Fed. Rule App. Proc. 4(a)(1)(A), and failed to obtain a certificate of appealability as required by 28 U. S. C. §2253(c). Section 2253(c) provides, as relevant here, that "[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from . . . the final order in a habeas corpus proceeding."

We granted certiorari, 572 U. S. ___, (2014), to decide whether Jennings was required to file a notice of cross-appeal and seek a certificate of appealability to pursue his *Spisak* theory.

## II

The rules governing the argumentation permissible for appellees urging the affirmance of judgment are familiar, though this case shows that familiarity and clarity do not go hand-in-hand.

## A

An appellee who does not take a cross-appeal may "urge in support of a decree any matter appearing before the record, although his argument may involve an attack upon the reasoning of the lower court." *United States* v. *American Railway Express Co.*, 265 U. S. 425, 435 (1924). But an appellee who does not cross-appeal may not "attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary."

*Ibid.* Since Jennings did not cross-appeal the denial of his *Spisak* theory, we must determine whether urging that theory sought to enlarge his rights or lessen the State's under the District Court's judgment granting habeas relief.

The District Court's opinion, in its section labeled "Order," commanded the State to "release Jennings from custody unless, within 120 days, the State of Texas grants Jennings a new sentencing hearing or resentences him to a term of imprisonment as provided by Texas law at the time of Jennings['] crime." 2012 WL 1440387, at *7. The District Court's corresponding entry of judgment contained similar language. App. 35. The intuitive answer to the question whether Jennings' new theory expands these rights is straightforward: Jennings' rights under the judgment were what the judgment provided—release, resentencing, or commutation within a fixed time, at the State's option; the *Spisak* theory would give him the same. Similarly, the State's rights under the judgment were to retain Jennings in custody pending resentencing or to commute his sentence; the *Spisak* theory would allow no less.

The State objects to this straightforward result. A conditional writ of habeas corpus, it argues, does not merely entitle a successful petitioner to retrial (or resentencing), but it entitles him to retrial (or resentencing) *without the challenged errors.* Because each basis for habeas relief imposes an additional implied obligation on the State (not to repeat *that* error), each basis asserted by a successful petitioner seeks to lessen the State's rights at retrial, and therefore each additional basis requires a cross-appeal.

This is an unusual position, and one contrary to the manner in which courts ordinarily behave. Courts reduce their opinions and verdicts to judgments precisely to define the rights and liabilities of the parties. Parties

seeking to enforce a foreign court's decree do not attempt to domesticate an opinion; they domesticate a *judgment.* Restatement (Third) of Foreign Relations Law of the United States §§ 481–482 (1987). A prevailing party seeks to enforce not a district court's reasoning, but the court's *judgment. Rogers* v. *Hill*, 289 U. S. 582, 587 (1933). This Court, like all federal appellate courts, does not review lower courts' opinions, but their *judgments. Chevron, U. S. A., Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842 (1984). And so a rule that contravenes this structure, that makes the opinion part of the judgment, is peculiar—especially when it is applied to impose extrajudgment obligations on a sovereign State.

The State's argument might have force in a case where a district court *explicitly* imposes (or the appellee asks the appellate court explicitly to impose) a condition governing the details of the retrial. But that case is not before us. The implications of the State's position make clear why such orders are atypical, and why we should not infer such conditions from silence. Construing every federal grant of habeas corpus as carrying an attendant list of unstated acts (or omissions) that the state court must perform (or not perform) would substantially transform conditional habeas corpus relief from an opportunity "to replace an invalid judgment with a valid one," *Wilkinson* v. *Dotson*, 544 U. S. 74, 87 (SCALIA, J., concurring), to a general grant of supervisory authority over state trial courts.

In a variation on the same theme, the dissent posits that, apart from implied terms, a habeas petitioner who successfully defends a judgment on an alternative ground *has* expanded his rights under the judgment, because he has changed the judgment's issue-preclusive effects. This theory confuses a party's rights under a judgment—here, the right to release, resentencing, or commutation, at the State's option—with preclusive effects that the judgment might have in future proceedings. That makes nonsense

of *American Railway*. *Whenever* an appellee successfully
defends a judgment on an alternative ground, he changes
what would otherwise be the judgment's issue-preclusive
effects. Thereafter, issue preclusion no longer attaches to
the ground on which the trial court decided the case, and
instead attaches to the alternative ground on which the
appellate court affirmed the judgment. Restatement
(Second) of Judgments § 27 (1982). Thus, making altera-
tion of issue-preclusive effects the touchstone of necessity
for cross-appeal would require cross-appeal for *every* de-
fense of a judgment on alternative grounds. That is, of
course, the polar opposite of the rule we established in
*American Railway*.

Under the habeas court's judgment, Jennings was enti-
tled, at the State's option, to either release, resentencing,
or commutation of his sentence. Any potential claim that
would have entitled Jennings to a new sentencing proceed-
ing could have been advanced to "urge . . . support" of the
judgment within the meaning of *American Railway*. 265
U. S., at 435. The dissent and the State contend that
applying *American Railway* in this fashion will lead to a
proliferation of frivolous appellate defenses in habeas
cases. If so, that is a problem that can only be solved by
Congress. Until it does so, we think it appropriate to
adhere to the usual law of appeals.

We think, however, that the danger is exaggerated. To
begin with, not all defenses will qualify. A habeas appli-
cant who has won resentencing would be required to take
a cross-appeal in order to raise a rejected claim that would
result in a new trial. Similarly, even if a habeas applicant
has won retrial below, a claim that his conduct was consti-
tutionally beyond the power of the State to punish would
require cross-appeal. And even a successful applicant
doing no more than defending his judgment on appeal is
confined to those alternative grounds present *in the rec-
ord*: he may not simply argue *any* alternative basis, re-

gardless of its origin. *Ibid.*

Moreover, successful habeas applicants have an incentive to defend their habeas grants effectively, an objective that is not furthered by diverting an appellate court's attention from a meritorious defense to a frivolous one. The dissent gives two examples of habeas petitioners who raised numerous ostensibly frivolous claims. *Post*, at 9. They prove nothing except the dissent's inability to substantiate its claim that our holding will foster the presentation of frivolous alternative grounds for affirmance. For both examples involved habeas petitioners who *lost* before the magistrate and were casting about for any basis that might justify a writ. We are talking here about habeas petitioners who have *won* before the district court. The notion that they can often be expected to dilute their defense of the (by-definition-nonfrivolous) basis for their victory by dragging in frivolous alternative grounds to support it is thoroughly implausible. Indeed, as the State and Jennings agree, it is rare that a habeas petitioner successful in the district court will even be called upon to defend his writ on appeal.

And finally, we doubt that any more judicial time will be wasted in rejection of frivolous claims made in defense of judgment on an appeal already taken than would be wasted in rejection of similar claims made in (what the State and dissent would require) a separate proceeding for a certificate of appealability. To be sure, as the dissent points out, *post*, at 9, the certificate ruling will be made by just one judge rather than three; but that judge will *always* be required to consider and rule on the alternative grounds, whereas the three-judge court entertaining the government's habeas appeal will not reach the alternative grounds unless it rejects the ground relied on by the lower court. Not to mention the fact that in an already-pending appeal the court can give the back of its hand to frivolous claims *en passant*, whereas the certificate process requires

the opening and disposition of a separate proceeding.

In the end, the dissent tries to evade *American Railway* by asserting that habeas corpus is "unique." *Post*, at 7. There are undoubtedly some differences between writs of habeas corpus and other judgments—most notably, that habeas proceedings traditionally ignored the claim-preclusive effect of earlier adjudications. But the reality that *some things* about habeas are different does not mean that *everything* about habeas is different. The dissent must justify why the particular distinction it urges here— abandonment of the usual *American Railway* rule—is an appropriate one. It cannot.

### B

The State also advances what could be termed a corollary to the *American Railway* rule. Citing *Helvering* v. *Pfeiffer*, 302 U. S. 247 (1937), and *Alexander* v. *Cosden Pipe Line Co.*, 290 U. S. 484 (1934), the State insists that a cross-appeal is necessary not only for Jennings to enlarge his rights under the District Court's judgment, but also to attack the District Court's ruling rejecting his *Spisak* theory, even if Jennings' rights under the court's judgment would remain undisturbed.

The view of *Pfeiffer* and *Alexander* advanced by the State would put these cases in considerable tension with our oft-reaffirmed holding in *American Railway*. And it is not the correct view. Both *Pfeiffer* and *Alexander* arose from disputes between the Commissioner of the Internal Revenue Service and taxpayers regarding multiple discrete federal tax liabilities. *Pfeiffer*, *supra*, at 248; *Alexander*, *supra*, at 486. In *Pfeiffer*, the Commissioner prevailed before the Board of Tax Appeals on his contention that a dividend was taxable, but lost a similar claim against a cash payment. Only the taxpayer sought the Second Circuit's review, and the taxpayer prevailed on the dividend liability. 302 U. S., at 249. In *Alexander*, the

taxpayer sought refund of four tax liabilities; the taxpayer won on all four. Only the Commissioner appealed to the Tenth Circuit, and that court affirmed two of the refunds, eliminated a third, and reduced a fourth. *Pfeiffer*, *supra*, at 248–249; *Alexander*, *supra*, at 486. The Commissioner sought our review in both cases; we refused to entertain the Commissioner's arguments regarding the cash payment in *Pfeiffer*, or the taxpayer's regarding the eliminated and reduced claims in *Alexander*, citing *American Railway*.

The State argues that these holdings expanded the need for cross-appeal, beyond merely those arguments that would enlarge rights under the judgment, to those arguments that revisit a lower court's disposition of an issue on which a judgment rests. For, the State argues, the rejected arguments would not *necessarily* have expanded the Commissioner's or the taxpayer's rights; if some of the points on which the respective appellee won below were rejected on appeal, his new arguments might do no more than preserve the amount assessed.

But this view of *Pfeiffer* and *Alexander* distorts *American Railway*. *American Railway* does not merely require a cross-appeal where a party, if fully successful on his new arguments, would certainly obtain greater relief than provided below; it requires cross-appeal if the party's arguments are presented "*with a view* either to enlarging his own rights thereunder or of lessening the rights of his adversary." 265 U. S., at 435. In *Pfeiffer* and *Alexander* the assertion of additional tax liabilities or defenses, respectively, necessarily sought to enlarge or to reduce the Commissioner's rights, even if, under some combination of issues affirmed and reversed, one possibility would have produced no more than the same tax obligations pronounced by the judgment below.

Once we have rejected the State's—and dissent's— theories of implied terms in conditional writs, Jennings'

*Spisak* theory sought the same relief awarded under his *Wiggins* theories: a new sentencing hearing. Whether prevailing on a single theory or all three, Jennings sought the same, indivisible relief. This occurred in neither *Pfeiffer* nor *Alexander*, and we decline to view those cases as contradicting our '"inveterate and certain"' rule in *American Railway. Greenlaw* v. *United States*, 554 U. S. 237, 245 (2008).

## C

Finally, the State urges that even if Jennings was not required to take a cross-appeal by *American Railway*, *Pfeiffer*, and *Alexander*, he was required to obtain a certificate of appealability. We disagree.

Section 2253(c) of Title 28 provides that "an appeal may not be taken to the court of appeals" without a certificate of appealability, which itself requires "a substantial showing of the denial of a constitutional right." It is unclear whether this requirement applies to a habeas petitioner seeking to cross-appeal in a case that is already before a court of appeals. Section 2253(c) performs an important gate-keeping function, but once a State has properly noticed an appeal of the grant of habeas relief, the court of appeals must hear the case, and "there are no remaining gates to be guarded." *Szabo* v. *Walls*, 313 F. 3d 392, 398 (CA7 2002) (Easterbrook, J.).

But we need not decide that question now, since it is clear that §2253(c) applies only when "an appeal" is "taken to the court of appeals." Whether or not this embraces a cross-appeal, it assuredly does not embrace the defense of a judgment on alternative grounds. Congress enacted §2253(c) against the well-known, if not entirely sharp, distinction between defending a judgment on appeal and taking a cross-appeal. Nothing in the statute justifies ignoring that distinction.

The dissent laments that this result frustrates AEDPA's

purpose of preventing "frivolous appeals." *Post,* at 8. It can indulge that lament only by insisting that the defense of an appealed judgment on alternative grounds is itself an appeal. The two are not the same. The statutory text at issue here addresses the "tak[ing]" of an appeal, not "the making of arguments in defense of a judgment from which appeal has been taken." Extending the certificate of appealability requirement from the former to the latter is beyond the power of the courts.

\* \* \*

Because Jennings' *Spisak* theory would neither have enlarged his rights nor diminished the State's rights under the District Court's judgment, he was required neither to take a cross-appeal nor to obtain a certificate of appealability. We reverse the judgment of the Fifth Circuit and remand the case for consideration of Jennings' *Spisak* claim.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 13–7211

_____

## ROBERT MITCHELL JENNINGS, PETITIONER _v._ WILLIAM STEPHENS, DIRECTOR, TEXAS DE-PARTMENT OF CRIMINAL JUSTICE, COR-RECTIONAL INSTITUTIONS DIVISION

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[January 14, 2015]

JUSTICE THOMAS, with whom JUSTICE KENNEDY and JUSTICE ALITO join, dissenting.

The Court holds today that a prisoner who obtains an order for his release unless the State grants him a new sentencing proceeding may, as an appellee, raise any alternative argument rejected below that could have resulted in a similar order. In doing so, the majority mistakenly equates a judgment granting a conditional-release order with an ordinary civil judgment. I respectfully dissent.

I

Title 28 U. S. C. §2253(c)(1)(A), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), provides in relevant part: "Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from . . . the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court." Further, "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right," and the certificate must "indicate which specific issue or issues

satisfy [that] showing." §§2253(c)(2),(3). Because Jennings did not obtain a certificate of appealability (COA), we must consider whether, by raising his "cross-point," he took an appeal within the meaning of AEDPA.

I agree with the majority that if a habeas petitioner takes what is, in substance or in form, a cross-appeal to the Court of Appeals, then he must obtain a COA. The failure to obtain a COA is a jurisdictional bar to review. See *Gonzalez* v. *Thaler*, 565 U. S. ___, ___ (2012) (slip op., at 8). The critical question the Court faces is whether Jennings' "cross-point" was in fact a cross-appeal.

## II

## A

The majority correctly identifies the rule we apply to determine whether a party has taken a cross-appeal, *United States* v. *American Railway Express Co.*, 265 U. S. 425, 435 (1924), but then fails to apply it in accordance with the history of the writ of habeas corpus, our precedents concerning conditional-release orders, and traditional principles governing equitable relief. Each of these guides supports the conclusion that a prisoner who obtains a conditional-release order allowing the State to resentence him in a new proceeding is entitled, if the State elects that option, to a new sentencing proceeding free of the specific constitutional violation identified by the district court. Because a conditional-release order embodies this specific right, an appellee's attempt to add additional errors is an attempt to modify or expand his rights under the judgment.

For most of its existence, the writ of habeas corpus was understood far more narrowly than it is today. See *Wright* v. *West*, 505 U. S. 277, 285–287 (1992) (opinion of THOMAS, J.). Originally, it played only a procedural role: It issued as of right when a prisoner showed probable cause to believe he was being held illegally—that is, without a

conviction entered by a court of competent jurisdiction over the prisoner—and obligated the warden to file a "return" identifying the grounds of imprisonment. W. Church, A Treatise on the Writ of Habeas Corpus §§94, 122 (rev. 2d ed. 1893) (hereinafter Church). The "grant of the writ decided nothing except that there was a case calling for an answer by the gaoler." Goddard, A Note on Habeas Corpus, 65 L. Q. Rev. 30, 34 (1949). And the court's ultimate decision on the matter was limited to confirming the legality of the prisoner's confinement or ordering his immediate discharge. See Church §§130, 131.

The writ today, by contrast, is invoked to justify broad federal review of state criminal proceedings for constitutional violations. And, when a district court issues the writ, it usually enters a conditional-release order, offering the State a choice between immediate release or a retrial (or resentencing) within a defined period of time. See *Wilkinson* v. *Dotson*, 544 U. S. 74, 86–87 (2005) (SCALIA, J., concurring).

The purpose of a conditional-release order is to afford the State an opportunity to remedy the specific constitutional violation identified by the district court. Since its inception over a century ago, we have treated a conditional-release order as entitling a habeas petitioner not just to a new proceeding, but to a new proceeding that cures the specific defect identified by the district court. One of our earliest precedents contemplating such an order is *In re Bonner*, 151 U. S. 242, 259–260 (1894). That case involved a prisoner who had been lawfully convicted, but unlawfully ordered to serve his federal sentence in a state penitentiary. *Id.,* at 254–255, 260. Invoking its "power to control and direct the form of judgment to be entered in cases brought up before it on *habeas corpus*," the Court ordered the delay of discharge to allow the prisoner to be "taken before the court where the judgment was rendered, that *the defects* for want of jurisdiction *which are the subject of*

*complaint* in that judgment *may be corrected.*" *Id.*, at 261 (emphasis added); see also *Magwood* v. *Patterson*, 561 U. S. 320, 347 (2010) (KENNEDY, J., joined by, *inter alios*, ALITO, J., dissenting) ("[A] conditional grant of relief . . . allows the state court to correct an error that occurred at the original sentencing"). That understanding of habeas judgments has prevailed in an unbroken line of precedent. See *Richmond* v. *Lewis*, 506 U. S. 40, 52 (1992); *Hilton* v. *Braunskill*, 481 U. S. 770, 775 (1987); *Dowd* v. *United States ex rel. Cook*, 340 U. S. 206, 209–210 (1951); *Mahler* v. *Eby*, 264 U. S. 32, 46 (1924). Cf. *Dotson*, *supra*, at 86 (SCALIA, J., concurring) ("[T]he conditional writ serves only to 'delay the release . . . in order to provide the State an opportunity to correct the constitutional violation'" (quoting *Braunskill*, *supra*, at 775)).

When the State fails to cure the specific constitutional violation identified by the district court, the habeas petitioner is entitled to release. That is because the prevailing habeas petitioner has shown that his conviction or sentencing proceeding was unconstitutional and that he is therefore "actually entitled to release." *Dotson*, 544 U. S., at 86 (SCALIA, J., concurring). "Conditional writs enable habeas courts to give States time to replace an invalid judgment with a valid one, and the consequence when they fail to do so is always release." *Id.,* at 87. But that entitlement to release is tied to the constitutional violation identified by the Court. A State committing a new constitutional violation during the new sentencing proceeding will not be required to release the habeas petitioner under the old order. Cf. *Magwood*, *supra*, at 339 (explaining that a habeas petitioner who obtains a new sentencing proceeding on the basis of one error may subsequently raise, in a first habeas application, other errors repeated in that proceeding).

A habeas petitioner's rights under the conditional-release order are thus defined by the violation that justi-

fied its entry, not by the wording of the order. *Pitchess* v. *Davis*, 421 U. S. 482 (1975) (*per curiam*), makes that clear. *Davis* involved a prisoner who had obtained habeas relief because the prosecutor had failed to disclose a material and exculpatory laboratory report, in violation of *Brady* v. *Maryland*, 373 U. S. 83 (1963). 421 U. S., at 483. When the State moved to retry him, the prisoner discovered that the State had destroyed some of the physical evidence used against him at his initial trial. *Id.,* at 484. The District Court granted the prisoner's motion to convert its initial conditional-release order into an unconditional order. *Id.,* at 485. After the Court of Appeals affirmed that decision, this Court granted certiorari and reversed. *Id.*, at 486, 490. Although the conditional-release order provided only that the prisoner should be released unless the State moved to retry him within 60 days, *Davis* v. *Pitchess*, 388 F. Supp. 105, 114 (CD Cal. 1974), the Court read that conditional-release order to require the State to "provid[e] *respondent with the laboratory report*," in addition to moving to retry him within 60 days, *Davis*, 421 U. S., at 483 (emphasis added). Because the order did not address the separate issue of the physical evidence, the Court refused to allow the District Court to use its destruction as a basis for converting the conditional-release order to an unconditional order.

That decision makes sense when considered in light of traditional principles of equitable relief. "This Court has frequently rested its habeas decisions on equitable principles." *Withrow* v. *Williams*, 507 U. S. 680, 717 (1993) (SCALIA, J., concurring in part and dissenting in part). (Such principles remain relevant after AEDPA's enactment when they are consistent with the statutory scheme Congress adopted. See, *e.g., McQuiggin* v. *Perkins*, 569 U. S. ___, ___ – ___ (2013) (SCALIA, J., dissenting) (slip op., at 2–3).) And the Court has frequently recognized that an equitable "remedy must . . . be limited to the inadequacy

that produced" the asserted injury. *Lewis* v. *Casey*, 518 U. S. 343, 357 (1996). Thus, a conditional-release order will not "permit a federal habeas court to maintain a continuing supervision over a retrial conducted pursuant to a conditional writ granted by the habeas court." *Davis*, 421 U. S., at 490. But neither will a conditional-release order permit a State to hold a prisoner under a new judgment infected by the same constitutional violation that justified the order's entry in the first place. See *Dotson*, *supra*, at 87 (SCALIA, J., concurring); *Harvest* v. *Castro*, 531 F. 3d 737, 750 (CA9 2008); *Phifer* v. *Warden*, 53 F. 3d 859, 864–865 (CA7 1995). Such an interpretation of habeas judgments would render the writ hollow.

The history of the writ of habeas corpus, the treatment of conditional-release orders, and traditional principles of equitable relief resolve the dispute at issue here. A habeas petitioner awarded a conditional-release order based on an error at his sentencing proceeding is entitled, under that order, to a new proceeding without the specific constitutional violation identified by the district court. Raising any other constitutional violation on appeal would be an attempt to modify the prisoner's rights flowing from that order.

### B

Given these principles, the judgment of the Court of Appeals should be affirmed. Jennings prevailed in the District Court on two theories of ineffective assistance of counsel and lost on another. The District Court entered a conditional-release order instructing the State to release Jennings unless it granted Jennings a new sentencing hearing within 120 days or commuted his sentence. *Ante,* at 5. Under this Court's precedents, that general order embodies a specific instruction to the State with respect to a new sentencing proceeding: resentence Jennings without the two identified *Wiggins* errors. See *ante,* at 3 (citing

*Wiggins* v. *Smith*, 539 U. S. 510 (2003)). The State's failure to comply with that order would justify Jennings' release. Jennings attempted, through his cross-point, to expand his rights under the judgment when he attempted to alter the instruction to the State—adding an additional instruction about a *Spisak* error—and, accordingly, the grounds upon which he could obtain immediate release. See *ante*, at 3 (citing *Smith* v. *Spisak*, 558 U. S. 139 (2010)). Jennings' cross-point was in substance a cross-appeal for which he needed to obtain a COA.

## III

### A

The majority makes no attempt to reconcile its decision with the history of conditional-release orders, our precedents, or traditional limitations on equitable relief. Nor could it. Instead, it divines an "intuitive answer" to the question presented, *ante,* at 5, from the law of judgments. But not only is this the incorrect source of law, the majority's position is fundamentally at odds with the law of judgments on which it purports to rely.

The majority agrees that, to understand how the cross-appeal rule applies in a given case, one must understand the rights that parties obtained under the judgment at issue. But the majority refuses to look past the language of the conditional-release order. It is, of course, true that parties domesticate judgments, not opinions. *Ante,* at 5–6. And it is similarly true that prevailing parties enforce judgments, not reasoning. *Ante,* at 6. Those truisms, however, do not answer the question here, which is what rights flow from those judgments.

In answering *that* question, the majority simply announces that the rights that flow from a habeas petitioner's judgment are the same rights that flow from any other civil judgment. But that assertion ignores the unique context of habeas, in which the traditional principles of

the law of judgments have never applied. As explained above, the writ of habeas corpus was historically a purely procedural mechanism to obtain a court's determination as to the legality of a prisoner's confinement. Church §§94, 122, 130, 131. And that determination was never treated as an ordinary civil judgment entitled to res judicata effect. *Id.*, §386; see also *McCleskey* v. *Zant*, 499 U. S. 467, 479 (1991).

Even if the majority were correct that the law of judgments could simply be imported to the habeas context, it misapplies that law. Under long recognized principles, including the doctrine of preclusion, parties have greater rights under civil judgments than merely the particular relief afforded. A prevailing plaintiff's claims are wholly merged into his judgment, preventing a defendant, in a future action on that judgment, from availing himself of defenses that he could have raised in the court's first adjudication of the claims. Restatement (Second) of Judgments §18 (1980). And a defendant, whether victorious or not, can rely upon that judgment as the final adjudication of a particular claim, preventing the plaintiff from pursuing another action against him in the future on that same claim. *Id.*, §19. These principles give rights to the parties beyond the remedy ordered. By narrowly and artificially defining the rights flowing from a civil judgment as solely those rights identified in a written order, the majority disregards these basic principles. And because the majority purports to apply the general law of judgments, its decision will do damage well beyond the habeas context in which this case arises.

B

In the habeas context specifically, the majority's opinion invites the same frivolous appeals that Congress passed AEDPA to prevent. Although courts had long relied on the certificate of probable cause as a mechanism to prevent

frivolous appeals in habeas cases, AEDPA further narrowed access to such appeals with the creation of the COA requirement. *Miller-El* v. *Cockrell*, 537 U. S. 322, 356 (2003) (THOMAS, J., dissenting). A habeas petitioner cannot obtain a COA absent a substantial showing of the denial of a *constitutional*, not merely federal, right. See *Slack* v. *McDaniel*, 529 U. S. 473, 483–484 (2000). This requirement serves an important gatekeeping function. But the majority's decision will seriously undermine the courts' ability to perform this function by allowing prisoners to pursue *any* alternative allegation, no matter how frivolous, that would have justified the same new proceeding awarded in the conditional-release order below.

This danger is by no means "exaggerated," *ante,* at 7, as the majority suggests. Habeas petitioners frequently pursue 20 or more arguments on collateral review, even though they could more effectively concentrate on a handful of arguments. See, *e.g., Calvert* v. *Henderson*, 2012 WL 1033632, *1 (ED La., Mar. 27, 2012) (raising 26 allegations of ineffective assistance of counsel); *Battle* v. *Roper*, 2009 WL 799604, *13 (ED Mo., Mar. 24, 2009) (raising 1 double jeopardy issue and 20 allegations of ineffective assistance of counsel). I see little reason to suspect that the prisoners who file these scattershot applications will suddenly alter their strategy on appeal. Indeed, the experience of the Courts of Appeals suggests otherwise. See, *e.g., Jones* v. *Keane*, 329 F. 3d 290, 296 (CA2 2003) (noting, but refusing to consider absent a COA, a prevailing habeas petitioner's "alternative grounds" for affirmance— allegations of insufficiency of the evidence and ineffective assistance of both trial and appellate counsel). And the experience of the Courts of Appeals with this conduct is only likely to grow now that the majority has approved it. Where before only the United States Court of Appeals for the Seventh Circuit had permitted prevailing habeas petitioners to raise rejected claims as alternative grounds

for affirmance, now all Courts of Appeals will be subject to that rule.

The majority also overlooks a significant procedural distinction between an application for a COA and a merits appeal. The majority expresses "doubt that any more judicial time will be wasted in rejection of frivolous claims made in defense of judgment on an appeal already taken than would be wasted in rejection of similar claims made in . . . a separate proceeding for a certificate of appealability." *Ante,* at 8. But a COA can be decided by a single court of appeals judge, 28 U. S. C. §2253(c)(1), while a merits appeal must be heard by a three-judge panel. By mandating the involvement of two additional judges in the adjudication of these claims, today's ruling *triples* the burden on the Courts of Appeals.

\*　　\*　　\*

This Court has repeatedly recognized that AEDPA's purpose is to "reduc[e] delays in the execution of state and federal criminal sentences." *Ryan* v. *Valencia Gonzales*, 568 U. S. \_\_\_, \_\_\_ (2013) (slip op., at 17) (internal quotation marks omitted). One of the key ways in which AEDPA encourages finality is to narrow the scope of appellate review by requiring habeas petitioners to obtain COAs. The majority's decision undermines that legislative choice and, in so doing, transforms the understanding of conditional-release orders that has prevailed since the Court first announced their creation. I respectfully dissent.