# United States Court of Appeals
## For the Eighth Circuit

_____

No. 13-3388

_____

R.J. Zayed, in His Capacity as Court-Appointed Receiver for the Oxford Global Partners, LLC, Universal Brokerage FX, and Other Receiver Entities

*Plaintiff - Appellant*

v.

Associated Bank, N.A.

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: October 9, 2014
Filed: March 2, 2015

_____

Before RILEY, Chief Judge, WOLLMAN and BYE, Circuit Judges.

_____

RILEY, Chief Judge.

For a period of approximately three years ending in 2009, five schemers bilked unsuspecting investors of an estimated $190 million in a Minnesota Ponzi scheme. The schemers took in over $79 million of the investors' funds with the help of defendant Associated Bank, N.A. After the scheme was exposed, the district judge in a related case appointed a receiver to take custody of funds owned by the

schemers' estates and by organizations under their control (receiver entities).[1] The receiver then brought this action on behalf of the receiver entities, alleging Associated Bank aided and abetted the scheme. The district court granted Associated Bank's motion to dismiss for failure to state a claim and denied the receiver's request to file a motion to reconsider. The receiver appeals. We reverse and remand for further proceedings.[2]

## I.    BACKGROUND

### A.    Facts

In reciting the facts, "we accept as true the well-pleaded allegations in the . . . complaint," Varga v. U.S. Bank N.A., 764 F.3d 833, 836 (8th Cir. 2014), and we "'draw[] all reasonable inferences in favor of the nonmoving party,'" the receiver, Topchian v. JPMorgan Chase Bank, N.A., 760 F.3d 843, 848 (8th Cir. 2014) (quoting Simes v. Ark. Jud. Discipline & Disability Comm'n, 734 F.3d 830, 834 (8th Cir. 2013)).

The Ponzi schemers, including Trevor Cook and Patrick Kiley, convinced potential investors their money would be held in totally liquid and segregated

---

[1]On November 23, 2009, in a civil case brought by the U.S. Securities and Exchange Commission (SEC) against schemers Trevor Cook and Patrick Kiley and related individuals and organizations, a different district judge appointed named plaintiff R.J. Zayed as receiver. Thus, the district court in this case had ancillary jurisdiction. See Gibson v. Vinton, 21 F.2d 168, 170 (8th Cir. 1927) ("[A] federal court has jurisdiction of an ancillary suit by its receiver, [and] any suit by a receiver in winding up the affairs of a receivership, or for the collection of assets, or in defense of the property in his hands as receiver, is to be regarded as ancillary to the main suit, and is cognizable in the federal court."). See also Pope v. Louisville, N.A. & C. Ry. Co., 173 U.S. 573, 577 (1899). On April 5, 2013, the district court granted Zayed leave to recuse himself and appointed three other attorneys to act on Zayed's behalf. This opinion refers to the office, "receiver," and not to any particular person.

[2]We have appellate jurisdiction under 28 U.S.C. § 1291.

accounts and invested, with lucrative returns, in a currency exchange program with a Swiss trader, Crown Forex, SA. To convert the investors' funds to their own use, the schemers opened bank accounts where they could deposit the investors' checks written to one of the receiver entities. One of Kiley's employees referred Kiley to the employee's step-brother, Lien Sarles, an assistant vice president at Associated Bank. Having visited Kiley at his office before Kiley opened an account at Associated Bank, Sarles knew Kiley ran his supposed investment business, along with the radio program used to promote it, from a converted bedroom office and a basement in a suburban home. Sarles assisted Kiley and Cook in opening several accounts at Associated Bank, many of which Sarles understood would be used to hold investor funds.

Cook and Kiley wanted to open an account at Associated Bank in the name of Crown Forex, SA, but Sarles told Kiley it would be difficult to open an account for a foreign entity. Sarles recommended opening the account in the name of a domestic entity, Crown Forex LLC. Sarles personally met with Kiley to open the account for Crown Forex LLC. Kiley and his assistant, Julia Smith, signed account documents as "members" of Crown Forex LLC. When opening the account, Kiley did not provide required registration verification from the Minnesota Secretary of State, and Sarles was aware of this fact. Sarles told Kiley he must provide the documentation. Kiley never did so, because Crown Forex LLC was a fictional entity, not organized under any state's law. Yet the Associated Bank account application, "prepared by" an Associated Bank employee and signed by Kiley, falsely stated the Crown Forex LLC documentation was provided from a "[r]eport from a state registration information website." Kiley submitted another form, signed by Sarles for Associated Bank, falsely stating Crown Forex LLC was organized in the state of Minnesota. Although Sarles knew Associated Bank's monitoring department would freeze or close accounts without proper documentation, Sarles claims he forgot to contact Kiley about the missing Crown Forex LLC documentation.

Within two years, investors deposited over $79 million into the phony Crown Forex LLC account at Associated Bank. Although Sarles was aware the investors' funds theoretically were to be used for trading by Crown Forex, SA, none of the money in the Crown Forex LLC account was ever transferred to Crown Forex, SA, which was neither an owner of nor a signatory to the Crown Forex LLC account. Rather, the Crown Forex LLC funds were transferred to other accounts associated with the scheme both at Associated Bank and at other banks.

Sarles personally approved several such transfers requested by Cook, even though Cook was not a signatory on the Crown Forex LLC account—only Kiley and Smith were signatories. Sarles approved over $3 million in transfers from the Crown Forex LLC account to Cook's personal accounts, even though Sarles knew the Crown Forex LLC account held client investment funds and Cook had no signatory authority.

Associated Bank also issued checks from the Crown Forex LLC account that did not include the Crown Forex LLC name, but fictitiously read, "Client Disbursement Account." Some of the account applications for other receiver entities also contained falsehoods, such as fake suite numbers in the addresses. Although Associated Bank knew some of the accounts were to hold investment funds, the account applications stated the accounts would be checking or money market accounts.

In December 2008, the Swiss Financial Market Supervisory Authority (FINMA) announced it had frozen Crown Forex, SA's accounts. In February 2009, Google alerted that Crown Forex, SA was under investigation—the next day, Sarles organized a phone call with Cook. A few days later, one of the scheme investors received an email from FINMA stating Crown Forex, SA was no longer authorized to conduct business. That day, Sarles organized a phone call regarding "Crown Forex." FINMA two weeks later announced Crown Forex, SA would be liquidated.

Three days later, Sarles organized an "important" phone call with Cook. After the liquidation of Crown Forex, SA, Associated Bank continued to approve transfers of millions of dollars out of the Crown Forex LLC account to other accounts apparently unassociated with Crown Forex, SA, even though Associated Bank knew the Crown Forex LLC account had been set up as a vehicle for investments into Crown Forex, SA.

In June 2009, Cook asked Sarles to open an account for another fictitious entity, Basel Group LLC, "exactly like the Crown set-up." Like Crown Forex LLC, Basel Group LLC submitted an account application "prepared by" an Associated Bank employee, falsely asserting website verification of its registration with the secretary of state. At least within nine days of opening the account, Sarles knew Basel Group LLC did not have registration documentation listed on the Minnesota Secretary of State's website. There is no indication in the record Sarles did anything to follow up on the discrepancy.

In late June 2009, Associated Bank allowed Cook to transfer $600,000 of investors' money from the Crown Forex LLC account to Cook's personal account—for the stated purpose of buying a yacht. Sarles later "personally observed" Cook walk out the bank door carrying $600,000 in cash. The mechanics of this transfer "raised a red flag" for one bank employee and caused another to write to Sarles, "Is this guy on the up and up . . . something feels uncomfortable with him."

On June 29, 2009, near the end of the scheme, Associated Bank prepared fourteen cashier's checks for over $3.2 million from the Crown Forex LLC account. The cashier's checks' remitter information never identified Crown Forex LLC as the source of the funds, instead naming false remitters. Even after the *Star Tribune* published a newspaper article about a lawsuit filed against the Ponzi scheme principals, Associated Bank still approved a transfer of $101,000 of investor funds to the fictitious Basel Group LLC. A week later, Sarles was fired.

Cook stated he "d[id]n't think that [Sarles] thought anything was wrong with" opening an account for Crown Forex LLC rather than Crown Forex, SA. Cook claimed he "d[id]n't think [Sarles] thought there was a fraud going on." Cook stated the schemers told Sarles "the Crown Forex, LLC account was part of Crown Forex, and it was on their books, so I'm not so sure I'd say [Sarles] knew something, you know, fishy was going on."

## B.    Procedural History

The receiver's complaint brought four Minnesota state law claims against Associated Bank, each for aiding and abetting:  fraud (Count I); breach of fiduciary duty (Count II); conversion (Count III); and false representations and omissions (Count IV).[3]  The district court dismissed, with prejudice, all four counts for failing to state a claim.  See Fed. R. Civ. P. 12(b)(6).  Pursuant to local rule, the receiver requested leave to file a motion for the district court to consider amending the dismissal to be without prejudice, so as to allow the receiver to amend the complaint, but the district court denied the request.  The receiver appeals both orders.

## II.    DISCUSSION

"Whether a complaint states a cause of action is a question of law," and our "review on appeal [is] de novo." Miller v. Redwood Toxicology Lab., Inc., 688 F.3d 928, 936 (8th Cir. 2012).  "A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Fed. R. Civ. P. 10(c).  "'For that reason, a court ruling on a motion to dismiss under Rule 12(b)(6) may consider material attached to the complaint.'" Quinn v. Ocwen Fed. Bank FSB, 470 F.3d 1240, 1244 (8th Cir. 2006) (per curiam) (quoting Abels v. Farmers Commodities

---

[3]At a motion hearing, the district court seemed to dismiss Count IV because the receiver conceded it duplicated Count I.  Yet in its written order, the district court addressed Count IV as if it had not been dismissed, and Associated Bank does not raise the issue here, so we too consider Count IV together with the other three.

Corp., 259 F.3d 910, 921 (8th Cir. 2001)).  We consider the many attachments to the receiver's complaint, including Sarles's affidavit.  See Rasidescu v. Globe Coll., Inc., 105 F. App'x 121, 123 (8th Cir. 2004) (unpublished per curiam).

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (alteration in original) (quoting Fed. R. Civ. P. 8(a)(2) and Conley v. Gibson, 355 U.S. 41, 47 (1957)).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.

We consider "[t]wo working principles," id., in our analysis.  "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id.  "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss.  Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Id. at 679 (internal citation omitted).  "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'"  Twombly, 550 U.S. at 556 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

-7-

**A. Aiding and Abetting Claims**

In Minnesota, a tort claim for aiding and abetting has three elements:

(1) the primary tortfeasor must commit a tort that causes an injury to the plaintiff;

(2) the defendant must know that the primary tortfeasor's conduct constitutes a breach of duty; and

(3) the defendant must substantially assist or encourage the primary tortfeasor in the achievement of the breach.

Witzman v. Lehrman, Lehrman & Flom, 601 N.W.2d 179, 187 (Minn. 1999) (en banc). The second and third elements are in dispute in this case, and they are evaluated "in tandem." Id. at 188 (quotation omitted). "Whether the requisite degree of knowledge or assistance exists depends in part on the particular facts and circumstances of each case." Id. We consider "[f]actors such as the relationship between the defendant and the primary tortfeasor, the nature of the primary tortfeasor's activity, the nature of the assistance provided by the defendant, and the defendant's state of mind." Id.

"[Federal] Rule [of Civil Procedure] 9(b)'s particularity requirement for fraud applies equally to a claim for aiding and abetting." E-Shops Corp. v. U.S. Bank N.A., 678 F.3d 659, 663 (8th Cir. 2012) (applying Minnesota substantive law). "Rule 9(b) requires plaintiffs to plead 'the who, what, when, where, and how: the first paragraph of any newspaper story.'" Summerhill v. Terminix, Inc., 637 F.3d 877, 880 (8th Cir. 2011) (quoting Great Plains Trust Co. v. Union Pac. R.R., 492 F.3d 986, 995 (8th Cir. 2007)). Still, as Associated Bank concedes, "knowledge . . . may be alleged generally." Fed. R. Civ. P. 9(b). "But 'generally' is a relative term. . . . Rule 9 . . . does not give [a party] license to evade the less rigid—though still operative—strictures of Rule 8." Iqbal, 556 U.S. at 686-87.

### 1.  Actual Knowledge

"[A]iding and abetting liability is based on proof of a scienter—the defendants must *know* that the conduct they are aiding and abetting is a tort."  Witzman, 601 N.W.2d at 186.  "An aider and abettor's knowledge of the wrongful purpose is a 'crucial element in aiding or abetting' cases."  E-Shops, 678 F.3d at 663 (quoting FDIC v. First Interstate Bank of Des Moines, N.A., 885 F.2d 423, 431 (8th Cir. 1989)).

The receiver alleges Sarles—and thus Associated Bank—actually knew he was helping the schemers perpetuate their fraud, breach a fiduciary duty, convert the investors' money, and make false representations and omissions.  As to "the relationship between the defendant and the primary tortfeasor," Witzman, 601 N.W.2d at 188, Sarles was introduced to Kiley by Sarles's step-brother, who worked for Kiley, and Sarles visited Kiley at his home, which doubled as Kiley's place of business, before Kiley appeared at the bank to open an account.  Sarles knew the Crown Forex LLC account was ostensibly created as a vehicle for investors to be able to take part in the schemers' so-called investment plan, and Sarles knew the money in the Crown Forex LLC account was to be transferred to a Crown Forex, SA account in order to accomplish the planned investment.  Yet none of the transfers of investors' funds Sarles facilitated were from Crown Forex LLC to Crown Forex, SA.

Sarles actually knew Crown Forex LLC was not registered with the Secretary of State of Minnesota when Associated Bank accepted the account application stating registration documentation was gleaned from the secretary's website.  Sarles stated in his affidavit, "I told Kiley that he must send the documentation to me *after he completed a Secretary of State filing for Crown Forex LLC*."  (Emphasis added).  But this fact did not stop Sarles from personally helping Kiley and Smith open the account and signing a document on behalf of Associated Bank stating Crown Forex LLC was organized under the laws of Minnesota.  Sarles knew Associated Bank's monitoring department would freeze or close accounts without proper documentation,

and he knew Crown Forex LLC did not submit the documentation. Sarles admits he never contacted Kiley about the missing documentation to prevent Kiley's account from being frozen or closed.

Finally, even though Sarles actually knew Kiley and Smith were the signatories on the Crown Forex LLC account, Sarles knowingly authorized Cook, a non-signatory, to withdraw millions of dollars of investor money and deposit much of it in Cook's personal accounts. Associated Bank declares, "it is the *obligation* of a bank to permit a customer to transfer or withdraw his or her funds from an account." But we accept as true the clearly pled fact that the Crown Forex LLC account funds Cook withdrew were *not* Cook's funds. Associated Bank cannot claim it is obligated to permit one customer, like Cook, to withdraw another customer's funds.

To the extent a jury would afford Ponzi schemer Cook's assertions any credibility, Cook stated he did not think Sarles knew there was anything "fishy" about opening the Crown Forex LLC account. We consider Cook's general statements as to Sarles's awareness of the fraud alongside the other well-pled facts in the complaint. See Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 594 (8th Cir. 2009) ("[T]he complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible."). And despite Associated Bank's assertions—(1) to the district court that the receiver "has deposed the relevant players," and (2) to this court that the receiver "knows essentially everything he is ever going to know about what happened here"—the key player in this case, Sarles, has not been deposed by anyone, as far as we know.

The district court emphasized ¶ 74 of the complaint, which states, "Had Associated Bank investigated any of the numerous red flags it had before it as raised by several employees, Associated Bank would have uncovered and prevented the Ponzi scheme from flourishing." The district court read ¶ 74 as an admission by the

receiver that Associated Bank did not have actual knowledge of the scheme, but merely "should have known" about the scheme from the various "red flags" in view. But reading the complaint "as a whole," Braden, 588 F.3d at 594, the receiver "generally alleges the knowledge element in multiple paragraphs" and "also alleges circumstances strongly indicating knowledge" as to Sarles in particular, Anderson v. U.S. Bank N.A., No. A13-0677, 2014 WL 502955, at *6 (Minn. Ct. App. Feb. 10, 2014) (unpublished).  The receiver's "complaint details the Ponzi transactions, including dates and amounts of deposits and withdrawals, spanning over a period of several years.  Given [Associated Bank's] vigorous denial of having known of the Ponzi scheme, it is hard to envision how knowledge might be pleaded with any more particularity than [the receiver] has pleaded it." Anderson, 2014 WL 502955, at *6.

We conclude the facts as alleged in the receiver's complaint state "a plausible claim," Iqbal, 556 U.S. at 679, of the actual knowledge aiding and abetting element. Because we find the receiver adequately pled actual knowledge, we need not consider the receiver's alternate argument that constructive knowledge of the scheme by Associated Bank could also suffice.

### 2.    Substantial Assistance

"In addressing aiding and abetting liability in cases involving professionals, most courts have recognized that 'substantial assistance' means something more than the provision of routine professional services." Witzman, 601 N.W.2d at 188-89; see Anderson, 2014 WL 502955, at *5 (finding "Witzman's special-policy concerns regarding professionals apply with some force to banks").  "Some affirmative step is required, because 'the mere presence of the particular defendant at the commission of the wrong, or his failure to object to it, is not enough to charge him with responsibility.'" Am. Bank of St. Paul v. TD Bank, N.A., 713 F.3d 455, 462 (8th Cir. 2013) (quoting Witzman, 601 N.W.2d at 189).  "Assistance must 'further the fraud itself, and not merely constitute general aid to the tortfeasor.'" Anderson, 2014 WL

-11-

502955, at *7 (quoting <u>El Camino Res., Ltd. v. Huntington Nat'l Bank,</u> 722 F.Supp. 2d 875, 910-11 (W.D. Mich. 2010)).

The district court found the receiver did not adequately plead Associated Bank provided substantial assistance in the Ponzi scheme. But the district court does not mention the fact Sarles knowingly opened a bank account for a non-registered entity to hold investors' money and then authorized Cook, a non-signatory, to withdraw millions of dollars of investor money and deposit much of it into Cook's personal accounts. These were not routine transfers, <u>see</u> <u>Witzman</u>, 601 N.W.2d at 189, nor "quintessential banking activities," as Associated Bank describes them. Taking the well-pled facts as true, as we must, a jury reasonably could infer Associated Bank, through its vice president Sarles, knowingly opened undocumented bank accounts and facilitated the unauthorized transfer of investors' funds into the schemers' personal accounts—an obvious misappropriation.

We cannot predict whether a jury, surveying the evidence supplemented by discovery, will find Associated Bank either had actual knowledge of or substantially assisted in the asserted torts. But the facts alleged in the complaint give the receiver's claims "facial plausibility"—the receiver has pled "factual content that allows the court [and a jury] to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Iqbal</u>, 556 U.S. at 678.

### B.    Associated Bank's Affirmative Defenses
#### 1.    Motion to Determine

In Associated Bank's memorandum in support of its motion to dismiss, it also urged dismissal pursuant to the doctrines of res judicata and *in pari delicto*. The district court did not reach these issues because it dismissed the receiver's complaint for failure to state a claim. In its appellate brief, Associated Bank renewed the two arguments as alternative bases for affirmance. The receiver then filed a "motion to determine whether issues raised by [Associated Bank] without having filed a cross-

appeal are within the scope of this appeal," claiming Associated Bank should have filed a cross-appeal for this court to consider either of the alternative bases for dismissal.

The U.S. Supreme Court informs us when a cross-appeal is needed: "[A] party who does not appeal from a final decree of the trial court cannot be heard in opposition thereto when the case is brought there by the appeal of the adverse party. In other words, the appellee may not attack the decree with a view . . . to enlarging his own rights thereunder." United States v. Am. Ry. Exp. Co., 265 U.S. 425, 435 (1924). "But it is likewise settled that the appellee may, without taking a cross-appeal, urge in support of a decree any matter appearing in the record, although his argument may involve an attack upon the reasoning of the lower court or an insistence upon matter overlooked or ignored by it." Id.; see also Spirtas Co. v. Nautilus Ins. Co., 715 F.3d 667, 670-71 (8th Cir. 2013) (explaining when a party "is attempting only to sustain the same judgment on a different basis in the record, a cross-appeal is not required").

The receiver alleges a judgment of dismissal on the basis of res judicata "would enlarge [Associated Bank's] rights under the judgment" because it would allow Associated Bank to "contend that all future hypothetical counts whose gravamen is the Bank's assistance in defrauding investors — no matter what form, and regardless of whether it is ripe or presently-knowable — would be barred." The receiver also proposes "[a] judgment of *in pari delicto*" would allow Associated Bank "to contend that all hypothetical claims of any form by any of the Receivership entities — even those that are not yet ripe because they are hidden by the Bank's concealment, thus tolling any limitations period — would be doomed."

The receiver "confuses a party's rights under a judgment . . . with preclusive effects that the judgment might have in future proceedings." Jennings v. Stephens, 574 U.S. ___, ___, 135 S. Ct. 793, 799 (2015). "*Whenever* an appellee successfully

-13-

defends a judgment on an alternative ground, he changes what would otherwise be the judgment's issue-preclusive effects. Thereafter, issue preclusion no longer attaches to the ground on which the trial court decided the case, and instead attaches to the alternative ground on which the appellate court affirmed the judgment." Id. No cross-appeal was required for Associated Bank to suggest alternative bases for the same judgment the district court issued—dismissal of the complaint.

### 2. Res Judicata

In October 2009, six defrauded investors of this Ponzi scheme brought suit against Associated Bank in Wisconsin state court, which dismissed their complaint for failure to state aiding and abetting claims, among others. Affirming, the Wisconsin Court of Appeals concluded "the circuit court properly dismissed [the plaintiffs'] aiding and abetting claim because [they] did not allege that Associated intended to assist the customer's tortious conduct—a necessary element of aiding and abetting liability." Grad v. Associated Bank, N.A., 801 N.W.2d 349, 2011 WL 2184335, at *1 (Wis. Ct. App. 2011) (unpublished table decision). Associated Bank argues the Grad decision precludes the receiver from pursuing any claims against Associated Bank on behalf of any of the receiver entities, even though the entities were not parties to the Grad action, because the receiver was in privity with the Grad plaintiffs.

Without the district court's careful examination of the circumstances of this case and "the benefit of the district court's analysis," Bell v. Pfizer, Inc., 716 F.3d 1087, 1096 (8th Cir. 2013), we decline to address the res judicata defense. "'[W]e leave [it] to be addressed in the first instance on remand, without expressing any view as to [its] merit.'" Beckon, Inc. v. AMCO Ins. Co., 616 F.3d 812, 820 (8th Cir. 2010) (second and third alterations in original) (quoting Discovery Grp. LLC v. Chapel Dev., LLC, 574 F.3d 986, 990 (8th Cir. 2009)).

### 3.    *In Pari Delicto* Doctrine

The doctrine of *in pari delicto*, an "equitable defense," "operates to prevent wrongdoers at equal fault from recovering against one another and 'is based upon judicial reluctance to intervene in disputes between [wrongdoing] parties.'" Christians v. Grant Thornton, LLP, 733 N.W.2d 803, 814 (Minn. Ct. App. 2007) (alteration in original) (quoting State by Head v. AAMCO Automatic Transmissions, Inc., 199 N.W.2d 444, 448 (Minn. 1972)).   "[E]quitable decisions are discretionary." Id. at 815. "A paramount public interest . . . may call for judicial intervention in favor of one wrongdoer against the other in order to effectuate the enforcement of a public policy which overrides considerations of a benefit inuring to a wrongdoer." AAMCO, 199 N.W.2d at 448.

The district judge, in a case related to this case, ordered the appointment of the receiver in response to an SEC motion and memorandum determining "a receiver is necessary during the pendency of this litigation to marshal, conserve and recover assets for investors and to prevent any further dissipation of assets."   Thus the plaintiff here was appointed receiver for the estates of Cook and Kiley, and entities controlled by them.  Another related case held that "[b]ecause this case involves a Ponzi scheme, the Receivership Entities are considered victims of the fraud and thus creditors of the Ponzi scheme." Zayed v. Peregrine Fin. Grp., Inc., Civ. No. 12-269, 2012 WL 2373423, at *2 (D. Minn. June 22, 2012) (unpublished); see also Scholes v. Lehmann, 56 F.3d 750, 754 (7th Cir. 1995) ("Freed from [the schemers'] spell [the receiver entities] became entitled to the return of the moneys—for the benefit not of [the schemers] but of innocent investors—that [the schemers] had made the [receiver entities] divert to unauthorized purposes.").

We are mindful that the Minnesota Supreme Court advises that the *in pari delicto* doctrine should be applied critically, see AAMCO, 199 N.W.2d at 448 ("We do not forecast an uncritical application of this doctrine, for it is not without exception"), and we consider Christians' emphasis on the discretionary nature of this

-15-

equitable decision, see Christians, 733 N.W.2d at 815. We decline to "judicial[ly] interven[e]," AAMCO, 199 N.W.2d at 448, without the benefit of the district court having addressed the *in pari delicto* defense in the first instance. We remand to the district court for its determination of the issue and, as with the res judicata affirmative defense, we do not express any view on the merits.

## C.      Request for Leave to Amend

Because we conclude the receiver's complaint did state a claim and Associated Bank's motion to dismiss was improperly granted, we do not consider the receiver's appeal of the district court's order denying the receiver's request for leave to file a motion to reconsider.

## III.   CONCLUSION

We reverse the district court's order granting Associated Bank's motion to dismiss the receiver's complaint and remand to the district court for further proceedings consistent with this opinion.

_____