FILED
**United States Court of Appeals**
**Tenth Circuit**

**February 19, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

CHRISTOPHER HOBDY,

     Petitioner - Appellee,

v.

No. 18-1047

RICK RAEMISCH, Executive Director,
Colorado Department of Corrections; PHIL
WEISER, Attorney General for State of
Colorado,*

     Respondents - Appellants.
_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:15-CV-01745-RPM)**
_____

Lisa K. Michaels, Assistant Attorney General (Phil Weiser, Attorney General, with her
on the briefs), Criminal Appeals Section, Office of the Attorney General for the State of
Colorado, Denver, Colorado, appearing for Appellants.

Kathleen A. Lord, Lord Law Firm, LLC, Denver, Colorado, appearing for Appellee.
_____

Before **BRISCOE**, **HOLMES**, and **McHUGH**, Circuit Judges.
_____

**BRISCOE**, Circuit Judge.
_____

---

     * Pursuant to Fed. R. App. P. 43(c)(2), Phil Weiser is substituted for Cynthia
Coffman as an Appellant in this case.

Petitioner Christopher Hobdy, a Colorado state prisoner serving a lengthy sentence for first degree assault and aggravated robbery, filed an application for federal habeas relief pursuant to 28 U.S.C. § 2254. The district court granted Hobdy's application and ordered the State of Colorado to retry him within ninety days. Respondents Rick Raemisch, the Executive Director of the Colorado Department of Corrections, and Phil Weiser, the Attorney General for the State of Colorado, now appeal from the district court's decision. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we reverse the decision of the district court and remand with directions to enter judgment in favor of respondents.

I

*The underlying facts of Hobdy's case*

The Colorado Court of Appeals (CCA), in addressing Hobdy's direct appeal, summarized the underlying facts of Hobdy's case:

> The criminal charges against [Hobdy] arose from an assault on the victim[, Jerry Williams,] outside a convenience store [on May 15, 1997]. The victim was a police officer [with the City of Aurora, Colorado,] who had a terminal illness and was living in a hospice at the time of the assault.
>
> The victim had arrived at the store late at night [shortly after 1 a.m.] to purchase a few items. After leaving the store, he used the outside payphone. While the victim was on the phone, [Hobdy], who had made a purchase at the store shortly after the victim had left the store, approached the victim and asked him for a quarter. The victim said he did not have a quarter, and [Hobdy] then went back into the store.
>
> After making his phone call, the victim began walking back to the hospice. He heard footsteps behind him and saw that [Hobdy] was following him. [Hobdy] uttered a racial slur [i.e., "nigger"] and told the victim, "I'm going to get you." He then hit the victim with a shovel.

2

The victim fell to the ground, and his possessions fell out of his pocket. [Hobdy] then picked up the items and ran away.

The victim then went back into the store and told the clerk to call 911. Believing that his assailant would be depicted on the store's video surveillance tape, the victim asked the clerk to retrieve the tape. He provided police a description of his assailant.

The following day, the police showed [the victim] three still photographs they had made of [Hobdy] from the surveillance video tape. They did not know his identity at that time. From the photos, the victim identified [Hobdy] as his assailant.

State v. Hobdy, No. 98CA1361 at 1–2 (Colo. App. Mar. 30, 2000) (Hobdy I), available at Aplt. App., Vol. 2 at 13.

The victim, Williams, gave the police an audiotaped interview the day after the attack.

*Hobdy's state trial proceedings*

On May 22, 1997, Hobdy was charged by information in Arapahoe County District Court with two counts of attempted first degree murder (one count alleged "after deliberation" and the second count alleged "felony murder"), one count of first degree assault, and one count of aggravated robbery. Aplt. App., Vol. 3 at 24.

On the same day the information was filed, the prosecution filed a motion seeking permission to depose Williams who, the motion noted, was "residing in a hospice and . . . dying of cancer." Id. at 25. The state trial court granted the motion and the deposition of Williams was taken in May and June of 1997. Williams died in August of 1997.

3

The case was tried to a jury on March 9–20, 1998. The prosecution's evidence included, among other things, the audiotaped interview that Williams gave to police the day after the attack and the transcript of Williams' deposition, which was read to the jury.

Hobdy's "defense [at trial] was misidentification." Id., Vol. 2 at 168. Hobdy admitted being in the convenience store that evening, but he denied attacking Williams. According to Hobdy, he had been drinking at a nearby bar, left briefly to go to the convenience store, and then returned to the bar to meet his friends. "The thrust of [Hobdy's] defense was that due to the substantial pain medication the victim was taking at the time, any identification or testimony on his part was not credible." Id., Vol. 1 at 195. "The victim was established to be regularly taking Morphine, Haldol, Ativan, Robaxin, Dilantin, Benadryl, Decadron, and Reglan." Id.

"To rebut this defense, the [State] called two medical doctors," one of whom "treated the victim at the emergency room after the attack, and the other [of whom] was the victim's regular oncologist." Id. "Together, they opined that the victim's mental faculties were not affected by the medications the victim was taking at the time of the attack such that they would impair his ability to make a positive identification." Id. at 196. Hobdy "did not offer his own medical expert to refute the testimony of the two doctors called by the [State]." Id. at 169. But Hobdy's "[t]rial counsel did cross examine the witnesses, based on medical records and drug information, and also elicited specific examples of the victim suffering from

4

hallucinations, confusion, drowsiness, and other impairments related to his medications." Id.

The jury deliberations began later in the day on March 18, 1998, and continued through the next two days, March 19–20, 1998. During those deliberations, the jury sent several notes to the state trial court. To begin with, at approximately 11:35 a.m. on the first full day of deliberations—March 19, 1998—the jury sent a note to the trial court asking for permission to listen to the 911 tape recording and to watch the 7-11 surveillance video. The state trial court granted both of those requests.

Later that same day, at approximately 3:37 p.m., the jury sent a note to the state trial court asking two questions. The first question stated: "May we look at Jerry William's [sic] deposition testimony?" Id., Vol. 4 at 147, 152–53. The second question said:

> We are struggling with coming to agreement with the creditability [sic] of Jerry Williams' testimony. We have been debating this issue for most of the day. Since this testimony is key to coming to a concensus [sic] we believe that coming to a verdict will be difficult. Convictions remain firm on both sides. Due to evidence provided and its interpretation by individual jurors we are concerned that a verdict may not be attainable.

Id. at 149, 153.

The district court responded to the jury's first question with a written answer stating, "you may request in writing that the entire Jerry Williams' depositions be read to you in Court as was done during the trial." Id. at 160. After receiving that written answer, the jury contacted the court "and indicated they [we]re waiting for an answer on the second question." Id. at 160–61. The state trial court then responded

5

to the jury's second question by sending them back a written note stating: "The court must ask you whether you are making any progress towards a unanimous verdict or are deadlocked?" Id. at 149, 163. The jury responded with one word: "Deadlocked." Id. at 149. After receiving this response, the state trial court read the modified Allen instruction to the jury and sent them back to deliberate. Id. at 164–65.

Later that afternoon, the jury sent a note to the trial court outlining its "[p]lan for" the next day. Id. at 151. The note stated that the plan was to "1) hear taped interview of Jerry Williams" and "2) hear all three depositions of Jerry Williams read if possible by impartial parties." Id. The state trial court responded that it "w[ould] attempt to accommodate [their] request" the following day, March 20, 1998. Id.

At the outset of the following day, Friday, March 20, 1998, the state trial court allowed the jury to first "hear the taped interview of Jerry Williams." Id. at 183. The state trial court then arranged for several people to read Williams' deposition transcripts. After that reading was complete, the jury was sent back to deliberate.

At some point that afternoon, the jury sent out a note asking, "Can we have the large sign that was in the closing arguments re: Reasonable doubt? Elements of each crime?" Id. at 203. The state trial court responded: "The information requested is contained in the instructions of the court – if you need additional copies of some or all the instructions please specify by number." Id.

The jury then sent out another note stating, "We want the testimony of the person that was on the stand when they interjected the tape of Chris Hobdy & also

6

WANT, NeeD [sic] to hear the tape of defendant.  Thank you."  Id. at 204 (emphasis in original).  The state trial court responded to this note by stating:

> The court reporter who reported Detective Days [sic] testimony while a portion of Chris Hodby [sic] tape was played is not here and that testimony is not available until Monday.  The only request that the court can grant today is to play that portion of Chris Hobdy's tape that was played for you during the trial.

Id. at 205.  The jury responded: "We would like to listen to the taped interview today."  Id.  The state trial court granted that request.

According to the record, the jury also, at some unknown point in the deliberations, wrote a note to the court that said:

> Deliberations have broken down.  We find ourselves attacking each other not allowing the [sic] us to move toward a verdict.  We do not know where to go from here.  We have examined all the evidence given to us and still are deadlocked.  We don't know what else to look at.

Id., Vol. 2 at 8.  It is unclear if this "attacking each other" note was in fact delivered by the jury to the state trial court and, if so, when that occurred.

At approximately 4:50 p.m. on March 20, 1998, the state trial court spoke to the jurors about recessing for the weekend and reconvening the following Monday.  Id., Vol. 4 at 217–18.  The jury "indicated they'd like some more time," so the state trial court granted that request.  Id. at 218.  Later that day—it is unclear from the record precisely what time—the jury returned with a verdict.  The jury found Hobdy not guilty of the two attempted murder charges.  But it convicted him of first degree assault and aggravated robbery.  The jury also found that Hobdy "did use or possess

7

and threaten the use of a deadly weapon during the commission of the crime or during the immediate flight therefrom." Id. at 220.

The state trial court sentenced Hobdy to consecutive terms of imprisonment of twenty-eight years' and thirty years' imprisonment for the two counts of conviction, resulting in an aggregate sentence of fifty-eight years.

*Hobdy's direct appeal*

Hobdy filed a direct appeal, asserting five general propositions of error. The CCA affirmed Hobdy's convictions in an unpublished opinion issued on March 30, 2000. Hobdy I, No. 98CA1361 at 15. Hobdy filed a petition for writ of certiorari with the Colorado Supreme Court, but that was denied on September 5, 2000. There is no indication in the record that Hobdy filed a petition for writ of certiorari with the United States Supreme Court.

*Hobdy's Rule 35(b) motion for reduction of sentence*

On December 13, 2000, Hobdy filed a motion for reduction of sentence pursuant to Colo. R. Crim. P. 35(b). The state trial court denied that motion on December 29, 2000. Hobdy did not appeal from that ruling.

*Hobdy's Rule 35(c) postconviction proceeding*

On August 20, 2001, Hobdy filed a motion for state postconviction relief pursuant to Colo. R. Crim. P. 35(c) alleging that his trial counsel was ineffective in the following respects: (1) failing to adequately investigate whether the victim was competent to testify because of his terminal illness and pain medication; (2) failing to determine whether the victim was competent to make a proper identification at the

8

time of the assault; (3) failing to consult experts skilled in eyewitness identification and medication and pain issues, including an intoxication expert; (4) failing to seek a change of venue due to the fact that the victim worked as a police officer in the same jurisdiction in which Hobdy was tried; (5) failing to pursue a viable alternate suspect theory; (6) failing to adequately investigate alibi witnesses; (7) failing to account for the difficulties inherent in cross-racial identifications; and (8) failing to object when the state trial court, upon being advised by the jury that it was deadlocked, did not make the inquiries required under People v. Lewis, 676 P.2d 682 (Colo. 1984). Aplt. App., Vol. 2 at 30, 141. Hobdy also stated in his motion that he wanted to reserve the right to supplement the motion.

In July of 2005, Hobdy, through counsel, filed an amended motion for postconviction relief pursuant to Colo. R. Crim. P. 35(c). The amended motion included three new claims: (1) "[f]ailure of appellate counsel to advise the [CCA] that the trial court abused its discretion in finding Williams competent to testify," id. at 88; (2) "[f]ailure of appellate counsel . . . to advise the [CCA] that there [wa]s no transcript establishing that the trial court ever acknowledged the jury's ['attacking each other'] note" or made "Hobdy and his counsel . . . aware of" the note and, relatedly, failure of appellate counsel to argue that "it [wa]s structural error for [the] trial court to fail to make an [sic] preserve a record" regarding that jury note, id. at 92–93; and (3) "Hobdy received an enhanced sentence . . . in violation of the Sixth Amendment jury trial guarantee," as outlined by the Supreme Court in Blakely v.

9

Washington, 542 U.S. 296 (2004), and Apprendi v. New Jersey, 530 U.S. 466 (2000), id. at 100.

The state district court issued a decision on September 19, 2006, denying Hobdy's amended motion for relief under Colo. R. Crim. P. 35(c). The state district court concluded that the amended motion was successive and that, in addition, Blakely and Apprendi were inapplicable to Hobdy's sentence.

Hobdy appealed to the CCA. On September 25, 2008, the CCA issued an opinion concluding that Hobdy's original Rule 35(c) motion was timely, had never been ruled on by the state district court, and that Hobdy was entitled to an evidentiary hearing on the ineffective assistance of trial counsel claims asserted in the original motion. The CCA also concluded that the claims asserted in Hobdy's amended motion were time-barred unless Hobdy could establish justifiable excuse or excusable neglect.

On remand, the state district court held an evidentiary hearing and heard testimony from three defense witnesses: an expert in psychopharmacology, a legal expert in the field of postconviction relief, and the lawyer who drafted and filed the amended Rule 35(c) motion on Hobdy's behalf.

Following the hearing, the state district court issued a written order denying Hobdy's Rule 35(c) motion. At the outset of its order, the state district court noted that Hobdy effectively abandoned four of the ineffective assistance of trial counsel claims asserted in his original Rule 35(c) motion—failure to challenge "venue, failure to raise alternate suspect theories, inadequate alibi witness investigation, and

10

failure to account for cross-racial identification"—by failing to address those issues in subsequent briefing or at the evidentiary hearing. Id. at 166. The state district court in turn concluded that the three new claims asserted by Hobdy in his amended Rule 35(c) motion did not "meet the justifiable excuse or excusable neglect exception" and were therefore time-barred. Id. at 169. In reaching this conclusion, the state district court found that "[t]he 'attacking each other' note [from the jury] appeared in the file and the record before the [CCA]," the CCA thus "had the benefit of the jury notes, including the 'attacking each other' note" when it resolved Hobdy's direct appeal, and that the CCA "addressed all of the notes in question." Id.at 170–71. The state district court further concluded "that there [wa]s no justifiable excuse or excusable neglect for" the "untimely filing [of] the supplement to the original Rule 35(c)" motion, and that, consequently, "all additional issues contained in the [amended Rule 35(c) motion], including any issues surrounding the ['attacking each other'] jury note, [we]re time-barred . . . and w[ould] not be further considered." Id. at 171–72.

As for the claim asserted by Hobdy in his original Rule 35(c) motion that trial counsel was ineffective for failing to retain and present an expert in psychopharmacology, the state district court concluded "that failing to retain" such an "expert fell below the performance of reasonably effective assistance," but that this "error on the part of trial counsel" did not "create[] any real probability that the jury would not have convicted" Hobdy or otherwise "undermine[d] th[e] Court's confidence in the jury's verdict." Id. at 174. The court explained "that because the

11

type and extent of medications taken by the victim were made known to the jury, the lack of additional expert testimony from" the defense "d[id] not create a reasonable probability of a different result in the original trial." Id. at 172.

Hobdy appealed to the CCA. On August 14, 2014, the CCA issued an unpublished opinion affirming the state district court's order. The CCA "conclude[d] that the record support[ed] the postconviction court's determination that defendant did not prove that, had [trial] counsel retained an expert [in psychopharmacology] . . . to testify at trial, there was a reasonable probability that the result of the proceeding would have been different." Id. at 234. The CCA explained that it "reach[ed] this conclusion because [Hobdy's] first attorney, through cross-examination, submitted to the jury a great deal of the information about which the psychopharmacologist testified at the remand hearing" on the Rule 35(c) motion. Id. The CCA also noted that the jury was able to watch the surveillance tape from the convenience store and listen to the recording of the 911 call and, in turn, "evaluat[e] the victim's mental acuity at that time" based on this evidence. Id. at 237. In addition, the CCA noted that "[t]he jury was aware of the medications that the victim was taking; it heard about their side effects; it learned of their effect on the victim; and, although it 'strugg[led]' to 'agree[]' about the victim's credibility, it obviously overcame that struggle and reached an agreement." Id. at 238. "Under these circumstances," the CCA "conclude[d] that there [wa]s not a reasonable probability, meaning a probability sufficient to undermine [its] confidence in the outcome, that had the additional information from an expert [psychopharmacologist] . . . been presented to

12

the jury, the result would have been different." Id. at 238–39. The CCA further stated: "Defendant did not establish that there was a reasonable probability that such testimony would have been the 'ounce that makes the pound' that would have led the jury to acquit instead of to convict." Id. at 239. The CCA thus concluded that Hobdy's "ineffective assistance claim as to his first attorney fail[ed]." Id. at 240.

The CCA also rejected Hobdy's challenge to the state district court's conclusion that "there was no justifiable excuse or excusable neglect for the untimely filing of his [amended] postconviction motion." Id. The CCA noted that the amended postconviction motion was "presumptively time barred" under Colorado law. Id. at 243. And the CCA agreed with the state district court that there were no facts or circumstances that provided a justifiable excuse or excusable neglect to overcome that presumptive time bar. In particular, the CCA rejected Hobdy's argument that his fourth attorney, i.e., the one who prepared and filed the amended postconviction motion, was ineffective. The CCA noted that "[t]he fourth attorney did not start working on the case until 2004, which was *after* the three-year period for filing postconviction motions had lapsed." Id. at 244–45. The CCA concluded that "the fourth attorney could not have been ineffective" for the reason that "[t]he fourth attorney could not . . . have filed a timely second postconviction motion." Id. at 245.

Hobdy filed a petition for writ of certiorari with the Colorado Supreme Court. That petition was denied on March 2, 2015.

*Hobdy's filing of his federal habeas petition*

13

On August 12, 2015, Hobdy, through counsel, initiated these federal habeas proceedings by filing an application for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The application alleged four claims for relief.[1] Claim One alleged ineffective assistance of trial counsel for failing to consult with and present testimony from an expert in psychopharmacology. Claim Two alleged that Hobdy was "denied his right to counsel, to be present, and to a fair trial" resulting from the state trial court's "failure to disclose the 'attacking each other' . . . note from the jury." Aplt. App., Vol. 1 at 31. Claim Three alleged ineffective assistance of appellate counsel for failing "to (a) ensure a complete record on appeal (b) raise the claims set forth in Claim Two, and (c) alert the appellate court that the trial court had not told the parties about the jury note that stated the jurors were 'attacking each other' and were 'still deadlocked.'" Id. at 32. The final claim for relief alleged cumulative error. Id. at 34.

On November 30, 2017, the district court issued a memorandum opinion and order granting federal habeas relief in favor of Hobdy. The opinion and order began by addressing Hobdy's ineffective assistance of trial counsel claim. In analyzing this claim, the district court noted that the state district court had concluded that Hobdy's trial counsel's performance on this issue amounted to incompetence under prevailing standards, and that the CCA had silently affirmed that conclusion. Consequently, the

---

[1] The application included three additional claims, but Hobdy withdrew those claims before the district court could rule on them. Dist. Ct. Docket No. 41 at 9. Thus, those claims are not at issue in this appeal.

14

district court concluded that it was "obliged to accept" what it described as this "final determination" under 28 U.S.C. § 2254(e)(1). Id. at 198. The district court in turn concluded that "[t]he only issue to be determined" was "whether the [CCA's] determination of no prejudice [wa]s contrary to or a misapplication of clearly established law as determined by the Supreme Court or a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." Id. (citing 28 U.S.C. § 2254(d)(1) and (2)). The district court concluded "that the [CCA] incorrectly considered it necessary for [Hobdy] to show that the different result was required to be an acquittal." Id. Clearly established Supreme Court precedent, the district court concluded, "does not require a defendant to establish a reasonable probability that the jury would have acquitted, but rather that the result of the proceeding would have been different." Id. Instead, the district court stated, "[t]here [we]re other possible outcomes, including a hung jury, which would have been more favorable for Hobdy." Id.

Continuing, the district court concluded "there [wa]s a reasonable probability there would have been a different result absent [trial] counsel's ineffective assistance." Id. The district court explained: "There would in all probability have been a mistrial based on a hung jury—that is at least one juror having a reasonable doubt as to the credibility of the testimony of . . . Williams." Id. at 198–99. In arriving at this conclusion, the district court noted that "[t]here was no evidence to corroborate [Williams'] story" about what had occurred, and "[t]he jury obviously had great difficulty in making that determination as revealed in the notes to the

15

judge." Id. at 199. The district court further concluded that "[t]he scenario described by the [CCA] in the opinion on direct appeal [wa]s incomplete." Id. In particular, the district court noted that "[t]he record contain[ed] a note" from the jury indicating it was deadlocked "with no indication of when or if it was received by the [state trial] court and if there was any response to it." Id. at 200. The district court stated that "defense counsel was not made aware of [the note] until post conviction proceedings." Id. In addition, the district court noted that at approximately 4:50 p.m. on the last day of the jury's deliberations, the state trial judge met with the jury about recessing for the weekend and reconvening the following Monday, but that he did so "outside of counsel's presence and without making a record." Id. "Thus," the district court noted, "there [wa]s no way to know what communications occurred between the [state trial] judge and the jurors." Id.

The district court concluded that "[t]his haphazard handling of jury questions, failure to inform counsel of a jury communication, and failure to make a proper record of exchanges between the judge and jury [wa]s structural error which require[d] vacation of the conviction." Id. (citing United States v. Cronic, 466 U.S. 648, 659 n.25 (1984)). The district court then stated: "For the foregoing reasons, the Court concludes that . . . Hobdy received ineffective assistance of counsel, in violation of the Sixth Amendment, and [wa]s accordingly 'in custody in violation of the Constitution of the United States.'" Id. at 200–01 (quoting 28 U.S.C. § 2254(a)). The district court concluded that Hobdy was "therefore entitled to habeas relief" and that it was unnecessary for it "to consider the other claims and arguments submitted

16

in support of th[e] Application." Id. at 201. The district court ordered "[t]he State of Colorado [to] re-try . . . Hobdy on the charges upon which he was convicted within 90 days from the entry of judgment, failing which he shall be released from custody on those convictions, which are vacated by this Court and upon which no further proceedings shall be pursued." Id.

The district court entered judgment in the case on November 30, 2017.

On December 22, 2017, respondents filed three motions with the district court. The first was a motion for clarification. Id. at 210. Respondents asserted in that motion that "[t]he handling of one of the jury notes was raised [by Hobdy] as a separate claim in the habeas application, specifically, claim two, which alleged that [Hobdy] 'was denied his right to counsel, to be present, and to a fair trial . . . .'" Id. at 212. Respondents in turn noted that the district court's decision "d[id] not otherwise contain an explicit ruling on claim two," even though it relied heavily on the jury note issue in concluding that Hobdy was prejudiced by his counsel's failure to present testimony from an expert in psychopharmacology regarding the effects of Williams' medications on Williams' cognitive abilities. Id. Respondents asserted that "[i]t [wa]s unclear to [them] whether the quoted language from the order regarding the handling of the jury questions was part of the prejudice analysis for claim one or was a ruling on claim two." Id. Respondents asserted that it was their intention "to exercise their right to appeal," and "they want[ed] to ensure that their understanding of the court's order [wa]s correct." Id. Thus, respondents requested that the district court "clarify whether it ruled on claim two." Id. at 213.

17

The second motion filed by respondents was a motion for ruling on outstanding claims.  Respondents argued therein that, "[w]ithout a ruling on [Hobdy's] remaining claims," the district court's "order m[ight] not be a final, appealable order, meaning that the court of appeals would lack jurisdiction to hear an appeal."  Id. at 216.  Consequently, respondents asked the district court to amend its order to include language "deny[ing]" the remaining claims on the merits.  Id. at 217.

The third and final motion filed by respondents was a motion to alter the order and judgment.  Respondents argued that the district court "was not required to adopt the state court's ruling on counsel's performance" under the first prong of Strickland v. Washington, 466 U.S. 668 (1984).  Aplt. App., Vol. 1 at 222.  Rather, respondents argued, because the district court determined "that one of § 2254(d)'s exceptions had been met, [Hobdy's] claim, including the deficient performance prong, was subject to de novo review."  Id. (citing Fry v. Pliler, 551 U.S. 112, 119 (2007), and Berghuis v. Thompkins, 560 U.S. 370, 390 (2010)).  Respondents also argued that "the record support[ed] the conclusion that [Hobdy's trial] counsel made a reasonable strategic decision to elicit evidence of the effects of the victim's medications on his memory and ability to perceive from the victim's medical providers and other lay witnesses."  Id. at 223–24.

On January 5, 2018, the district court issued a two-page written order addressing respondents' three post-judgment motions.  The order first stated that "the Applicant was denied the assistance of trial counsel in responding to the jury's questions in violation of the Sixth Amendment as alleged in Claim Two."  Id. at 228.

18

The order in turn stated: "this Court agrees with the [state] district court's determination that the failure of the defense attorney to retain and present testimony from a medical expert as to the effects of the victim's intake of prescription medications on his ability to perceive, recall and relate was below the standard of care in violation of the first prong of Strickland." Id. Lastly, the order stated "that the Third Claim for Relief," which asserted ineffective assistance of appellate counsel, "[wa]s denied."[2] Id.

The district court issued an amended judgment that same day, January 5, 2018.

On January 10, 2018, respondents filed a motion seeking additional clarification prior to appeal. Id. at 232. The motion "request[ed] that the [district court] clarify whether it granted relief on Claim Two" in Hobdy's application. Id. at 234.

On January 11, 2018, the district court issued an order denying respondents' motion for additional clarification. The order contained one sentence: "it should be apparent to anyone reading the Order on Post-Judgment Motions (Doc. 70) that this Court has ruled on the merits of Claim Two, that this violation of the Sixth Amendment is an additional ground for granting the Writ of Habeas Corpus and that the claim was not procedurally defaulted." Id. at 236.

---

[2] The district court's order did not expressly mention the cumulative error claim that was alleged in Hobdy's application for federal habeas relief. But, because the order expressly purported to address each of the three pending motions, we construe the order as implicitly denying relief on the cumulative error claim.

19

Respondents filed a notice of appeal on February 2, 2018.

II

Respondents argue on appeal that the district court erred in granting federal habeas relief to Hobdy on his "claims of ineffective assistance of counsel and denial of the right to presence." Aplt. Br. at 1. For the reasons outlined below, we agree.[3]

*Standard of review*

"The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) requires a state prisoner seeking federal habeas relief first to 'exhaus[t] the remedies available in the courts of the State.'" Kernan v. Hinojosa, 136 S. Ct. 1603, 1604 (2016) (per curiam) (quoting 28 U.S.C. § 2254(b)(1)(A)). "If the state courts adjudicate the prisoner's federal claim 'on the merits,' § 2254(d), then AEDPA mandates deferential, rather than *de novo*, review." Id. Specifically, we cannot grant relief unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

---

[3] Respondents also argue that the district court abused its discretion when, in the course of granting federal habeas relief to Hobdy, it barred the state from conducting any retrial after a period of ninety days. Because we conclude that the district court erred in granting federal habeas relief to Hobdy, it is unnecessary for us to address this issue.

28 U.S.C. § 2254(d)(1)–(2).

"'Clearly established Federal Law' refers to the Supreme Court's holdings, not its dicta." Wood v. Carpenter, 907 F.3d 1279, 1289 (10th Cir. 2018) (citing Williams v. Taylor, 529 U.S. 362, 412 (2000)). "A state-court decision is only contrary to clearly established federal law if it 'arrives at a conclusion opposite to that reached by' the Supreme Court, or 'decides a case differently' than the Court on a 'set of materially indistinguishable facts.'" Id. (quoting Williams, 529 U.S. at 412–13). "But a state court need not cite the Court's cases or, for that matter, even be aware of them." Id. "So long as the state-court's reasoning and result are not contrary to the Court's specific holdings, § 2254(d)(1) prohibits us from granting relief." Id. (citing Early v. Packer, 537 U.S. 3, 9 (2002) (per curiam)).

"A state court's decision unreasonably applies federal law if it 'identifies the correct governing legal principle' from the relevant Supreme Court decisions but applies those principles in an objectively unreasonable manner." Id. (quoting Wiggins v. Smith, 539 U.S. 510, 520 (2003)). "Critically, an '*unreasonable* application of federal law is different from an *incorrect* application of federal law.'" Id. (quoting Williams, 529 U.S. at 410). "[A] state court's application of federal law is only unreasonable if 'all fairminded jurists would agree the state court decision was incorrect.'" Id. (quoting Frost v. Pryor, 749 F.3d 1212, 1225 (10th Cir. 2014)).

"Finally, a state-court decision unreasonably determines the facts if the state court 'plainly misapprehend[ed] or misstate[d] the record in making [its] findings, and the misapprehension goes to a material factual issue that is central to petitioner's

21

claim.'" Id. (quoting Byrd v. Workman, 645 F.3d 1159, 1170–72 (10th Cir. 2011)).

"But this 'daunting standard' will be 'satisfied in relatively few cases.'" Id. (quoting

Byrd, 645 F.3d at 1172).

*Ineffective assistance of trial counsel*

Respondents first argue that the district court erred in granting relief on the

basis of Claim One of Hobdy's federal habeas application, which alleged that

Hobdy's trial counsel was ineffective for failing to retain and present testimony from

an expert in psychopharmacology. More specifically, respondents argue that the

district court erred in concluding that the CCA unreasonably applied Strickland when

it rejected this claim on the merits. We agree with respondents.

*a) Clearly established federal law applicable to the claim*

The clearly established federal law applicable to this claim is the familiar two-

part test outlined by the Supreme Court in Strickland. 466 U.S. at 687. Under the

first part of that test, a "defendant must show that counsel's performance was

deficient." Id. at 668. "In light of the variety of circumstances faced by defense

counsel and the range of legitimate decisions regarding how best to represent a

criminal defendant, the performance inquiry necessarily turns on whether counsel's

assistance was reasonable considering all the circumstances." Wong v. Belmontes,

558 U.S. 15, 17 (2009) (per curiam) (internal quotation marks and brackets omitted).

Under the second part of the test, a "defendant must show that the deficient

performance prejudiced the defense." Strickland, 466 U.S. at 687. "This requires

showing that counsel's errors were so serious as to deprive the defendant of a fair

trial, a trial whose result is reliable." Id. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." Id. at 693. "Virtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." Id. (citation omitted). That said, however, "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." Id. "The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." Id. at 694. Thus, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

"The governing legal standard [thus] plays a critical role in defining the question to be asked in assessing the prejudice from counsel's errors." Id. at 695. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id.

"Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." Id. at 687.

23

*b) The state district court's analysis*

The state district court concluded, in addressing Hobdy's Rule 35(c) motion for postconviction relief, "that failing to retain a medical expert" to testify about the victim's medications and their effect on his ability to perceive, recall and relate "fell below the performance of reasonably effective assistance." Aplt. App., Vol. 2 at 174. The state district court explained that "[t]he People's medical expert testimony should not have been allowed to stand alone, especially given that the crux of [Hobdy's] defense [at trial] was attacking the victim's credibility." Id. As for the second prong of the Strickland test, however, the state district court concluded that trial counsel's error did not "create[] any real probability that the jury would not have convicted [Hobdy]." Id. The state district court explained that, due to Hobdy's trial counsel's cross-examination of the state's witnesses,[4] "the jury was well aware that the victim was not only taking morphine to manage his pain, but was taking many other powerful drugs," including "on the night in question." Id. at 175. Continuing, the state district court noted that "[h]aving another expert, this one from the defense, to share complicated medical expert testimony, would not have materially changed [the jury's] understanding with regard to the" credibility of the "victim's testimony . . . ." Id. at 176.

---

[4] These witnesses included the victim's oncologist, the emergency room doctor who treated the victim after the assault, two hospice nurses, the victim's girlfriend, and a friend of the victim.

24

*c) The CCA's analysis*

The CCA, for its part, focused on the second prong of the <u>Strickland</u> test and rejected Hobdy's argument "that, had his first attorney offered [an expert in psychopharmacology] to testify at trial, there [wa]s a reasonable possibility that the trial's result would have been different." <u>Id.</u> at 232. In doing so, the CCA discussed in detail the testimony of the expert in psychopharmacology that Hobdy presented "during the remand hearing" on his Rule 35(c) motion. <u>Id.</u> The CCA noted:

> The psychopharmacologist testified about the combination of medications that the victim had been taking. He stated that this combination affects the central nervous system, and that it can cause "abnormal thinking." He stated that the potential side effects of these medications include, among other things, hallucinations, confusion, fragmented memory, and blurred vision.

> The psychopharmacologist added that the victim was taking large doses of some of the medications. In a patient with an underperforming liver, like the victim, there was a higher potential to suffer side effects. He stated that he believed that the victim's oncologist had minimized the potential side effects of the medications when testifying at trial, and that the oncologist did not address the issue in the context of whether the combination would affect someone's ability to "accurately report information."

> The psychopharmacologist noted that he had identified ninety-four instances in the record and in the transcripts of the victim's depositions where the victim had suffered from the medications' side effects or appeared to be intoxicated by the medications. He explained that these reactions "would . . . affect [the victim's] ability to make judgment decisions and attend to what's going on."

> The psychopharmacologist testified that, on the night of the assault, the victim was "probably having side effects at the time of the [assault]" and that he did not believe the victim would be able to recall it reliably. He stated that, at the time of the assault, the victim "was

25

operating in a continued and almost perpetual altered mental state that could be . . . described as a state of abnormal thinking."

Id. at 232–33.

The CCA then stated: "We conclude that the record supports the [state district] court's determination that [Hobdy] did not prove that, had [trial] counsel retained an expert like the psychopharmacologist to testify at trial, there was a reasonable probability that the result of the proceeding would have been different." Id. at 234. The CCA explained that it "reach[ed] this conclusion because" Hobdy's trial counsel, "through cross-examination, submitted to the jury a great deal of the information about which the psychopharmacologist testified at the remand hearing." Id. More specifically, the CCA stated:

> We have compared the testimony presented at trial and the testimony offered at the remand hearing. The trial testimony from doctors, hospice nurses, and friends included statements about the medications the victim was taking at the time of the assault and their possible side effects, including confusion and hallucinations. Witnesses described specific instances when the victim had suffered these side effects. The first attorney elicited admissions from some of these witnesses that the high dosage of medications, combined with the victim's physical condition, could have increased the likelihood and severity of those side effects.
>
> And these witnesses provided testimony from a perspective that a witness such as the psychopharmacologist could not have duplicated. They examined, treated, and interacted with the victim. They saw him; they spoke with him; some of them saw him and spoke with him over a significant period during which he was taking the medications; and some of them saw him and spoke with him a short time after the assault.
>
> Indeed, the psychopharmacologist testified that "[he] wasn't there so [he couldn't] absolutely say" whether the victim was having adverse side effects at the time of the assault. Instead, he was "asked to review the records and determine what is the likelihood of something occurring

26

[sic]." Also, he stated that "it's hard to know whether someone's having some of the[] symptoms [caused by abnormal thinking] without assessing [the person] directly," and that an evaluation of the extent to which a person was suffering from a medication's side effects should include a physical examination of the individual. The expert conceded that he did not physically examine the victim.

He also admitted that he had not watched a surveillance videotape or listened to a 911 recording, from which he could have observed and listened to the victim on the night of the assault. He stated that these recordings would have been significant in evaluating the victim's mental acuity at that time. And the jury watched the videotape and listened to the 911 recording.

* * *

The evidence that *was* presented at trial was sufficient to cause the jury to question the victim's credibility. During the examination of one of the hospice nurses, a juror asked the nurse to repeat how many times the victim had taken morphine on the night of the assault. During deliberations, the jury submitted a note to the trial court, which stated, "We are struggling with coming to agreement with the credibility of [the victim's] testimony."

The jury was aware of the medications that the victim was taking; it heard about their side effects; it learned of their effect on the victim; and, although it "struggl[ed" to "agree[]" about the victim's credibility, it obviously overcame that struggle and reached an agreement. Under these circumstances, and based on the record before us, we conclude that there is not a reasonable probability, meaning a probability sufficient to undermine our confidence in the outcome, that had the additional information from an expert such as the psychopharmacologist been presented to the jury, the result would have been different. Defendant did not establish that there was a reasonable probability that such testimony would have been the "ounce that makes the pound" that would have led the jury to acquit instead of to convict.

Id. at 236–39.

27

Thus, in sum, the CCA rejected Hobdy's ineffective assistance of trial counsel claim due to Hobdy's "fail[ure] to establish prejudice," and without directly addressing the first prong of Strickland. Id. at 240.

*d) The federal district court's analysis*

As we have previously noted, the district court concluded that, under 28 U.S.C. § 2254(e)(1), it was "obliged to accept" the state district court's "final determination" regarding the first prong of the Strickland test. Aplt. App., Vol. 1 at 198. The district court then examined the CCA's analysis of the second prong of the Strickland test and the CCA's resulting determination that Hobdy was not prejudiced by his counsel's allegedly deficient performance. Citing one particular sentence in the CCA's decision, the district court concluded "that the [CCA] incorrectly considered it necessary for [Hobdy] to show that the different result was required to be an acquittal." Aplt. App., Vol. 1 at 198 (quoting and citing the CCA's statement that: "Defendant did not establish that there was a reasonable probability that such testimony would have been the 'ounce that makes the pound' that would have led the jury to acquit instead of to convict"). The district court stated that "Strickland does not require a defendant to establish a reasonable probability that the jury would have acquitted, but rather that the result of the proceeding would have been different," and it noted that "[t]here [we]re other possible outcomes, including a hung jury, which would have been more favorable for Hobdy." Id. And, apparently reviewing the issue de novo, the district court concluded that, had Hobdy's trial counsel presented expert testimony from a psychopharmacologist, "[t]here would in

28

all probability have been a mistrial based on a hung jury–that is at least one juror having a reasonable doubt as to the credibility of the testimony of [victim] Jerry Williams." Id. at 198–99.

In explaining the reasons for its conclusion, the district court briefly noted that "[t]here was no evidence to corroborate [Williams'] story" and "[t]he jury obviously had great difficulty in making that determination as revealed in the notes to the judge." Id. at 199. The district court then focused on the jury's deliberations and the notes sent by the jury to the state trial court and concluded: "This haphazard handling of jury questions, failure to inform counsel of a jury communication, and failure to make a proper record of exchanges between the judge and jury is structural error which requires vacation of the conviction."[5] Id. at 200. Lastly, the district court stated: "For the foregoing reasons, the Court concludes that . . . Hobdy received

---

[5] This statement was apparently intended by the district court to address Claim Two of Hobdy's federal habeas application, since that claim concerned the state trial court's handling of the "attacking each other" jury note. But that was not clear from the face of the district court's decision because the district court made no express reference to Claim Two, and it ultimately emphasized that it was granting federal habeas relief in favor of Hobdy because he "received ineffective assistance of counsel, in violation of the Sixth Amendment." Aplt. App., Vol. 1 at 200–01. This is presumably what led to respondents seeking clarification of the district court's order. The district court subsequently stated, in addressing respondents' motion for clarification, that it was granting federal habeas relief on two grounds: Hobdy's ineffective assistance of counsel claim for failing to present testimony from a psychopharmacologist, and what the district court stated was its conclusion that Hobdy "was denied the assistance of trial counsel in responding to the jury's questions in violation of the Sixth Amendment as alleged in Claim Two." Id. at 228. Consequently, for purposes of this opinion, we treat the district court's references to the "attacking each other" jury note, and its structural error conclusion, as related to Claim Two of Hobdy's federal habeas application.

ineffective assistance of counsel, in violation of the Sixth Amendment, and is accordingly 'in custody in violation of the Constitution of the United States.'" Id. at 200–01 (quoting 28 U.S.C. § 2254(a)).

*e) The flaws in the district court's analysis*

We conclude that the district court's analysis was erroneous in at least two respects. To begin with, the district court erred in concluding that § 2254(e)(1) required it "to accept" the state district court's "final determination" regarding the first prong of the Strickland test. Aplt. App., Vol. 1 at 198. Section 2254(e)(1) provides only that "a determination of a factual issue made by a State court shall be presumed to be correct" and that "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). A district court's decision regarding the first prong of the Strickland test, such as the one pointed to by the district court in this case, is not a factual finding (although it typically involves underlying factual findings), but rather a legal determination that is subject to review under § 2254(d) rather than § 2254(e)(1). See Strickland, 466 U.S. at 698 ("[A] state court conclusion that counsel rendered ineffective assistance is not a finding of fact binding on the federal court to the extent stated by 28 U.S.C. § 2254(d).").

Second, even assuming that Hobdy did satisfy the first prong of the Strickland test, the district court erred in concluding that the CCA unreasonably applied the second prong of the Strickland test when the CCA focused on the possibility or probability of acquittal, rather than the possibility of a hung jury and a resulting

30

mistral. [6]  Nothing in Strickland suggests that the prejudice standard can be satisfied by something less than an acquittal.  To the contrary, the Court in Strickland stated "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding."  466 U.S. at 693.  Instead, the Court held, "[w]hen a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  Id. at 695.  Thus, the CCA's decision, which focused on the probability of acquittal, was neither contrary to nor an unreasonable application of Strickland.  See Frost, 749 F.3d at 1226 n.9 (noting, in dicta, that it was not unreasonable for state appellate court applying the Strickland standard to focus on the probability of acquittal, rather than simply a "different result").

*f) The CCA's decision was reasonable*

Setting aside the district court's analysis, we conclude that the CCA's analysis and resolution of Hobdy's ineffective assistance of counsel claim was neither contrary to, nor an unreasonable application of, Strickland and its prejudice prong. See 28 U.S.C. § 2254(d).  To begin with, the CCA correctly discussed the controlling legal principles outlined in Strickland, including the requirements of the prejudice

---

[6]  Notably, Hobdy never argued the theory that was relied on by the district court.  In his brief to the CCA, Hobdy argued that "if [his] trial counsel had used a medical expert . . . , a reasonable probability exist[ed] that the jury would have found [him] not guilty."  Aplt. App., Vol. 2 at 218.  Nowhere did Hobdy argue the possibility of a hung jury and resulting mistrial.  Likewise, in his application for federal habeas relief, Hobdy did not argue that the CCA erred in failing to consider the possibility of a hung jury and mistrial.

prong.  Aplt. App., Vol. 2 at 228–29.  The CCA then carefully examined the testimony that was elicited at trial from the State's various witnesses regarding the victim's drug regimen and its likely effects on his ability to perceive, recall and relate.  The CCA in turn examined the expert testimony presented by Hobdy at the Rule 35(c) evidentiary hearing regarding that same topic.  The CCA compared the trial testimony to the expert testimony presented at the Rule 35(c) evidentiary hearing and concluded there was not a reasonable probability that the outcome of the trial would have been different had Hobdy's trial counsel presented expert testimony like that presented by Hobdy at the Rule 35(c) evidentiary hearing.  The CCA stated that it "reach[ed] this conclusion because [Hobdy's trial counsel], through cross-examination, submitted to the jury a great deal of the information about which the psychopharmacologist testified at the [Rule 35(c)] hearing." Id. at 234.  The CCA noted that "[t]he evidence that *was* presented at trial," including that elicited by Hobdy's trial counsel via cross-examination, "was sufficient to cause the jury to question the victim's credibility," and that "although [the jury] 'struggl[ed]' to 'agree[]' about the victim's credibility, it obviously overcame that struggle and reached an agreement." Id. at 238 (emphasis in original).

Nothing about this analysis was contrary to or an unreasonable application of clearly established Supreme Court precedent.  In terms of the "contrary to" prong of § 2254(d), the Supreme Court has never addressed a case involving materially indistinguishable facts, and thus the CCA did not decide Hobdy's case differently than the Supreme Court.  Williams, 529 U.S. at 412–13.  Nor did the CCA arrive at a

32

conclusion opposite to that reached by the Supreme Court on a question of law. Id.

In terms of the "unreasonable application" prong of § 2254(d), the CCA did not

unreasonably apply the principles outlined in Strickland to Hobdy's case. Id. at 415–

16. Rather, the CCA's consideration and rejection of Hobdy's ineffective assistance

claim appears to have been entirely reasonable and thus does not provide Hobdy an

avenue for federal habeas relief under § 2254(d).

For these reasons, we reverse the district court's order granting federal habeas

relief on the basis of Hobdy's claim that his trial counsel was ineffective for failing

to consult with and offer evidence from an expert in psychopharmacology.

*Denial of the right to counsel, presence, and a fair trial*

In their second issue on appeal, respondents argue that the district court also

erred in granting federal habeas relief on Claim Two of Hobdy's federal habeas

application. Claim Two alleged that the state trial court denied Hobdy "his right to

counsel, to be present, and to a fair trial by [its] failure to disclose the 'attacking each

other' 'still . . . deadlocked' note from the jury." Aplt. App., Vol. 1 at 31. The

district court, in its initial memorandum opinion and order, concluded that the

"haphazard handling of jury questions, failure to inform counsel of a jury

communication, and failure to make a proper record of exchanges between the judge

and jury [wa]s structural error which require[d] vacation of [Hobdy's] conviction."

Id. at 200. Subsequently, in its January 5, 2018 order addressing respondents' post-

judgment motions, the district court "ORDERED" that Hobdy "was denied the

assistance of trial counsel in responding to the jury's questions in violation of the Sixth Amendment as alleged in Claim Two." Id. at 228.

*a) Claim Two is procedurally barred*

Respondents argue that Claim Two of Hobdy's federal habeas application—as actually framed in the application—is procedurally barred due to Hobdy's failure to fairly present the claim to the CCA "in any of his three appeals in that court." Aplt. Br. at 43. According to respondents, "[t]he first and only time [Hobdy] presented the claim that his right to presence was violated by the trial court's alleged failure to disclose the 'attacking each other' jury note was in a post-hearing brief on the remand from his postconviction appeal." Id. at 44. Respondents assert that the state district court "did not address this new claim, and [Hobdy] did not present it to the CCA in the remand appeal." Id. at 44–45. Respondents also argue that Hobdy "may not now present the claim as an independent constitutional ground for relief because it would be barred as untimely under Colo. Rev. Stat. § 16-5-402 (2017) and as an abuse of process under Colo. R. Crim. P. 35(c)(3)(VII)." Id. at 46. "Both of these rules," respondents argue, "are independent of federal law and adequate to sustain a procedural default." Id.

We agree. In his original Rule 35(c) motion, Hobdy made no mention of the "attacking each other" jury note and raised no claims related to that note. In his amended Rule 35(c) motion, Hobdy argued that his appellate counsel was ineffective for failing to argue to the CCA that (a) "there [wa]s no transcript establishing that the trial court ever acknowledged the jury's ['attacking each other'] note," (b) the trial

34

court never made "Hobdy and his [trial] counsel . . . aware of" this note, or (c) "it [wa]s structural error for [the] trial court to fail to make an [sic] preserve a record' regarding this note.[7] Aplt. App., Vol. 2 at 92–93. But he did not otherwise assert any of the claims that he now alleges in Claim Two of his federal habeas application, i.e., that the state trial court denied him "his right to counsel, to be present, and to a fair trial by [its] failure to disclose the 'attacking each other' 'still . . . deadlocked' note from the jury." Aplt. App., Vol. 1 at 31. Thus, the allegations asserted in Claim Two of Hobdy's federal habeas application were never addressed by the state district court or the CCA and are unexhausted. See generally Kimmelman v. Morrison, 477 U.S. 365, 374 n.1 (1986) (holding that Sixth Amendment claim was distinct from the underlying Fourth Amendment claim).

Further, the allegations in Claims Two are subject to an anticipatory procedural bar. "'Anticipatory procedural bar' occurs when the federal courts apply procedural bar to an unexhausted claim that would be procedurally barred under state

---

[7] That claim of ineffective assistance of direct appeal counsel was rejected by the state district court as untimely. The state district court found that "[t]he 'attacking each other' note appeared in the file and the record before the [CCA]" on direct appeal. Aplt. App., Vol. 2 at 170. "Therefore," the court concluded, "a failure to explicitly raise this on appeal, necessitating the application of the justifiable excuse or excusable neglect standard in allowing the untimely supplement which raise[d] th[e] argument, [wa]s not persuasive" and the court "lack[ed] the province to address the matter . . . under Crim. P. 35(c)(3)(VI)." Id. at 171. Hobdy did not appeal this ruling to the CCA. Indeed, the CCA subsequently noted that Hobdy argued "justifiable excuse or excusable neglect" in the remand proceedings, but "d[id] not reassert those grounds" in his appeal from the remand proceedings, and thus "ha[d] abandoned any argument concerning them." Id. at 241. Consequently, at no point did the CCA address any issues related to or arising out of the "attacking each other" jury note.

35

law if the petitioner returned to state court to exhaust it." Moore v. Schoeman, 288 F.3d 1231, 1233 n.3 (10th Cir. 2002). If Hobdy were to attempt to now assert the allegations in the Colorado state courts in a Rule 35(c) motion, they would be deemed time-barred. See Colo. Rev. Stat. § 16-5-402(1) (requiring petitions for post-conviction relief to be filed within three years for all non-class 1 felonies; class 1 felonies are those punishable by life imprisonment or the death penalty). Thus, the claims are procedurally barred for purposes of federal habeas review. Moore, 288 F.3d at 1233 n.3.

Although it is not entirely clear from the record, it appears that the district court—obviously troubled by the state trial court's apparent failure to notify the parties about the jury's "attacking each other" note—*sua sponte* raised the issue of structural error. Doing so, however, was clearly inconsistent with the dictates of § 2254(d), which places strict limitations on a state prisoner's ability to obtain federal habeas relief. See Ellis, 872 F.3d at 1091 (emphasizing that "a federal court may grant habeas relief only with respect to federal claims that state prisoners have appropriately exhausted by adequately presenting the substance of the claims to the appropriate state court for review"). Because Hobdy never raised any such structural error claim in his federal habeas application, and because the CCA rejected Hobdy's claim of structural error (which, as noted, was actually couched as an ineffective assistance of appellate counsel claim) as procedurally barred, the purported structural error found by the district court cannot operate as a basis for granting federal habeas relief.

36

Thus, in sum, Claim Two of Hobdy's federal habeas application is procedurally barred and cannot serve as the basis for the grant of federal habeas relief.

*Hobdy's request for relief on "contingent claims"*

Hobdy, in his appellate response brief, argues that even if we disagree with the district court's resolution of Claims One and Two of his federal habeas application, he is nevertheless entitled to federal habeas relief on the basis of Claims Three (ineffective assistance of appellate counsel) and Four (cumulative error). Aple. Br. at 19, 47–58. We are not, however, persuaded that Hobdy is entitled to affirmance of the district court's judgment—federal habeas relief in the form of a new trial—on the basis of either of those claims.[8] See generally Jennings v. Stephens, 574 U.S. –, 135 S. Ct. 793, 802 (2015) (recognizing that a habeas petitioner may, in response to the appeal of a decision granting him relief, and without obtaining a certificate of appealability, urge alternative grounds for affirmance of the district court's judgment).

In Claim Three, Hobdy asserts that his appellate counsel "failed to adequately review the record on appeal and mishandled the appellate issues related to the jury's deadlock notes." Aple. Br. at 19. Hobdy concedes, as he must, that the CCA denied that same claim "on procedural default grounds, finding (1) the amended motion was

---

[8] The district court denied relief on Claims Three and Four and Hobdy did not obtain a COA or file a cross-appeal regarding those claims. Under Jennings, however, it was unnecessary for him to do so in order to urge those claims as an alternative basis for affirmance of the district court's judgment.

untimely under [Colo. Rev. Stat.] § 16-5-402 . . . and (2) the 'justifiable excuse or excusable neglect' exception to this statutory limitations period did not apply." Id. at 48. In particular, the CCA rejected Hobdy's argument that the attorney who prepared his amended Rule 35(c) motion "was ineffective because she did not timely raise the issue of" ineffective assistance of appellate counsel. Aplt. App., Vol. 2 at 240–41.

Hobdy argues, however, that the CCA's "ruling unreasonably ignored the fact that" the attorney who prepared the amended Rule 35(c) motion "was never counsel of record" and instead "was working under [the] supervision" of the attorney who "was counsel of record." Aple. Br. at 51. Hobdy further argues that "[c]ounsel of record" in the Rule 35(c) proceeding "was responsible for preserving Hobdy's right to raise his claim of [ineffective assistance of appellate counsel] by adhering to any applicable statute of limitations." Id.

We reject Hobdy's arguments. The CCA emphasized in its decision that Hobdy's "written argument[s] after the remand hearing . . . focused solely on the . . . attorney" who prepared the amended Rule 35(c) motion, and not on his counsel of record in the Rule 35(c) proceeding. Aplt. App., Vol. 2 at 244. The CCA "also note[d] that" Hobdy's counsel of record in the Rule 35(c) proceeding "did not testify at the remand hearing," and that Hobdy "did not contend during the remand proceedings," or in the appeal from the remand proceedings, that his counsel of record in the Rule 35(c) proceeding "was ineffective." Id. Lastly, "[b]ecause a prisoner does not have a constitutional right to counsel in state postconviction

38

proceedings, ineffective assistance in those proceedings does not qualify as cause to excuse a procedural default." Davila v. Davis, 137 S. Ct. 2058, 2062 (2017). Thus, we conclude that Claim Three—Hobdy's ineffective assistance of appellate counsel claim—was defaulted in state court on an independent and adequate state procedural ground and, in turn, is procedurally barred for purposes of federal habeas review.

In Claim Four, Hobdy asserts that his "right to due process of law was violated by the cumulative effect of error." Aple. Br. at 57. We reject Claim Four, however, because "we have discerned through the lens of AEDPA only one" assumed error, i.e., trial counsel's failure to retain and present testimony from an expert in psychopharmacology, and it is well-established that "there must be more than one error to conduct cumulative-error analysis." Ellis, 872 F.3d at 1090.

### III

The judgment of the district court is REVERSED and the case REMANDED to the district court with directions to enter judgment in favor of respondents on Hobdy's application for federal habeas relief.